[Civ. No. 9965. Third Dist. Apr. 14, 1961.]

CROFOOT LUMBER, INC. (a Corporation), Plaintiff and Appellant, v. DON FORD et al., Defendants; WILLIAM MOORES et al., Cross-complainants and Appellants; JACK LEWIS et al., Cross-defendants and Respondents.

*Assigned by Chairman of Judicial Council.

Sullivan, Roche, Johnson & Farraher, Theodore A. Kolb and Spurr & Brunner for Plaintiff and Appellant.

Brobeck, Phleger & Harrison and Donald D. Connors for Cross-complainants and Appellants.

Kasch & Cook, Burke & Rawles and Francis M. Passalacqua for Cross-defendants and Respondents.

WARNE, J. pro tem.*—Two separate appeals arising out of this action are here presented for determination: (1) Plaintiff-appellant, Crofoot Lumber, Inc., a corporation, hereinafter referred to as Crofoot, appeals from a money judgment in its favor awarding damages equivalent to the stumpage value of certain merchantable timber wrongfully removed from its land. It is the contention of Crofoot that the trial court erred in not awarding multiple damages pursuant to section 733 of the Code of Civil Procedure and section 3346 of the Civil Code, or in the alternative, that if it is not entitled to damages under section 3346, it would be entitled to damages under the theory of conversion under section 3333 of the Civil Code and that said damages should be measured by the amount of money received by the defendants for the property, with interest from the date of conversion. (2) An appeal by cross-complainants, William Moores and William Smith, individually, and as copartners doing business under the name of Moores and Smith, from that part of the judgment entered in favor of the cross-defendants, Henry Thompson, Jack Lewis and Austin Rawles, wherein the trial court found that the cross-defendants did not agree to indemnify cross-complainants against any loss or liability arising out of the cutting of the timber and therefore denied cross-complainants any relief on that issue.

This is a companion case to *Crofoot Lumber, Inc.* v. *Thompson*, 163 Cal.App.2d 324 [329 P.2d 302], which we shall refer to at times during the course of this decision as the "first case." It appears from the facts as related in the first case that Crofoot and its predecessors entered into a contract with defendant Henry Thompson and one Jack Edsell on August 15, 1949, for the sale of merchantable timber on land owned by Crofoot. Shortly thereafter Edsell assigned his interest in the contract to Thompson. Thompson breached the contract, and on August 17, 1954, Crofoot rescinded the agreement. On October 28, 1954, Crofoot instituted the first action, wherein it alleged the rescission and sought a judgment, among other things, that it had rescinded.

While that action was pending and at issue awaiting trial, Crofoot discovered that the timber upon said property was being logged off by defendant Don Ford under instructions of defendants William Moores and William Smith, individually, and as copartners doing business as Moores and Smith,

*Assigned by Chairman of Judicial Council.

Garcia Loggers, a corporation, and Hollow Tree Lumber Company, a corporation (all of which are hereinafter referred to as the Moores group). The Moores group claimed to have obtained their right to cut the timber under a contract with the defendants Jack Lewis, Austin Rawles and Henry Thompson. Immediately upon learning of the timber removal, Crofoot commenced the present action, wherein it asked the court to enjoin the trespass. On March 9, 1956, Crofoot was granted a temporary restraining order against the defendants, and thereafter a hearing on the motion for a preliminary injunction was had. Plaintiff's motion for a preliminary injunction was denied.

After the denial of the preliminary injunction, the defendants proceeded to log the property, and in approximately 77 days removed the timber in question here.

On August 6, 1956, the first case, namely, *Crofoot Lumber, Inc.* v. *Thompson, supra,* went to trial, and a judgment in favor of Crofoot was rendered therein on February 8, 1957, declaring the contract to have been rescinded. This judgment was affirmed by this court on September 3, 1958, and a hearing in the Supreme Court was thereafter denied.

On February 24, 1959, the instant action went to trial before the court sitting without a jury. Final judgment was entered on September 10, 1959.

In the first case, *Crofoot Lumber, Inc.* v. *Thompson, supra,* it was decreed that since August 17, 1954, Crofoot had been the owner in fee simple and entitled to the possession of the land and the timber standing thereon, and that the claims of Thompson, Edsell, Lewis and all others claiming under them were without right and they were enjoined from further asserting such claim.

It appears that on October 7, 1955, Edsell, for a consideration of $250, executed a quitclaim transferring any right or interest which he may have had at that time in said timber to Lewis.

In December, 1955, Lewis contacted William Moores, the latter acting on behalf of the Moores defendants, and offered to sell the timber here involved to Moores. Moores had an investigation made of the property by his head forester, contacted his attorney and asked him to check into the outstanding leases between Crofoot and Thompson. After investigation, Moores' attorney advised him that it would be all right for Moores to buy the timber provided he obtained a hold-harmless agreement from Lewis, Rawles and the other

sellers, agreeing to hold Moores harmless in the event of an adverse decision in the action then pending. Lewis advised Moores that he was not willing to do this, and for the time being the matter came to rest at that point.

Moores also contacted H. C. Crofoot, Sr., and H. C. Crofoot, Jr., and was advised by both of them that Crofoot claimed full interest to this property and that neither Edsell, Thompson nor Lewis had any interest in, or right or title to, the timber.

In February, 1956, Lewis again contacted Moores in an effort to reactivate the negotiations pertaining to the timber. Moores then advised Lewis that the Moores group was prepared to buy the timber on a stumpage basis provided they could have a hold-harmless agreement. Discussions pertaining to price on a stumpage basis took place between Lewis and Moores, and these discussions also involved a negotiation between Lewis and Moores concerning the purchase by Lewis of an airplane which belonged to one of Moores entities. An agreement was finally reached by Lewis and Moores at a price of $18 per thousand board feet for the redwood and $12 per thousand for the fir. This agreement, according to Moores, also included the sale of an airplane to Lewis for $3,000 less than the original asking price, which amount, according to Moores, was made up by reduction in the timber price to Moores of one dollar per thousand of three million feet of stumpage.

Lewis then proceeded to Healdsburg where he saw Passalacqua at the latter's office and asked Passalacqua to draft a contract and come to Ukiah for a meeting between Lewis, Moores, Thompson and Rawles in order to complete the negotiations which were pending between himself and Moores.

Passalacqua, without first talking to Thompson, proceeded to prepare a draft of a contract and took the same to Ukiah on February 22, 1956. He there met Thompson and reviewed with him the proposed contract for sale of the timber to Moores and Smith. After discussion with Thompson, Passalacqua and Thompson proceeded, in the company of Lewis and Rawles, to the office of Moores. As the trial court stated in its opinion, "What actually went on at this meeting is difficult to determine from the conflicting accounts of it by those who were present, but it is clear to the Court that an agreement was discussed by Moores, Lewis, and Rawles, wherein the sellers were to sell and the buyers were to buy this timber at $12.00 per thousand for fir and $18.00 per

thousand for redwood." Passalacqua participated in this discussion, and the various terms of a proposed contract were orally agreed upon. Moores suggested that the changes which had been agreed upon should be reduced to writing right then and there, but Passalacqua advised that he was late for another engagement and would have to leave. He agreed to reduce the changes to writing at his office in Healdsburg and said he would return the engrossed contract to Lewis. It is agreed by all parties that Thompson said nothing at the meeting. The trial court found as a fact that at this time Thompson did not agree to the contract of sale from Lewis and Rawles to Moores and Smith, but later, on May 12, 1956, agreed to recognize the contract which had been signed by Lewis and Rawles. Passalacqua was not a party to the contract.

Moores and Smith transferred their rights under the contract dated February 22, 1956, to Garcia Loggers, a corporation, which later merged into Hollow Tree Lumber Company. Garcia hired Don Ford, an independent logger, to cut the timber and contracted to sell the logs to Hollow Tree Lumber Company.

As we have heretofore stated, on March 9, 1956, after Don Ford had moved onto the property and had begun to cut the timber, the present action was commenced; a temporary restraining order was issued on March 9th also; and on March 19, 1956, the preliminary injunction was denied and the temporary restraining order dissolved. Logging once again commenced and was completed by June 1, 1956. Money due Lewis, Rawles and Thompson from Moores and Smith was deposited in a trust account pending the outcome of both suits.

Crofoot first contends that the trial court should have allowed treble damages as provided in section 3346 of the Civil Code and section 733 of the Code of Civil Procedure.

The trial court found that all of the defendants, at the time of the removal of the timber by Don Ford, were aware that plaintiff (Crofoot) had attempted to rescind the August 15, 1949, contract with Thompson and Edsell, but defendants believed that the purported rescission was ineffectual and they had reasonable grounds for so believing; at the time of the removal of the timber they believed they had a right to do so; they were not, nor were any of them, actuated by malice or ill will toward the plaintiff in so removing the timber.

In *Stewart* v. *Sefton*, 108 Cal. 197, 206 [41 P. 293], the court held that "To entitle the plaintiff to treble damages,

under section 733 of the Code of Civil Procedure, she must have proved her allegation that defendant willfully or maliciously removed the trees, knowing them to be the property of plaintiff.'' That case was cited and the rule reiterated in *Butler* v. *Zeiss,* 63 Cal.App. 73, 77 [218 P. 54]. Crofoot argues that *Swall* v. *Anderson,* 60 Cal.App.2d 825 [141 P.2d 912]; *Fick* v. *Nilson,* 98 Cal.App.2d 683 [220 P.2d 752]; and *Roche* v. *Casissa,* 154 Cal.App.2d 785 [316 P.2d 776], are in apparent disagreement in that in the Fick case the court laid down the rule that in order to entitle a plaintiff to treble damages there must be a showing that the defendant was guilty of a willingness to vex, harass, annoy or injure the plaintiff; but that in the Roche case, *supra,* there was no such showing and that the apparent rule there is that sufficient malice is shown if a wrongful injury was not casual and involuntary or committed under the belief that the land belonged to the trespasser.

In the Fick case, *supra,* the court said at page 685: '' [T]o warrant treble damage in such a case it must be established that the wrongful act was one which was willful and malicious. (*Stewart* v. *Sefton,* 108 Cal. 197 [41 P. 293]; *Butler* v. *Zeiss,* 63 Cal.App. 73 [218 P. 54]; *Wolfsen* v. *Hathaway,* 32 Cal.2d 632, 650 [198 P.2d 1].) In the latter case, it is said:

'' 'An award of punitive damages may not be based upon mere speculation, but rather such penalty depends upon a definite showing of a ''willingness to vex, harass, annoy, or injure. . . And this is necessarily so, for the law, having made full compensation for the *act,* can thereafter be concerned solely with the *motive* of the act. The wrongful act has been redressed by full compensation. The improper motive which actuated it may be punished by an award of exemplary damages.'' ' ''

The court in the Wolfsen case held at page 650 that since the appellant's tortious acts upon the premises had ''stemmed not from any 'malice in fact,' but wholly from a mistaken claim of right under the belief that his 'oral lease' was valid and enforceable, the 'wrongful personal intention to injure' that calls forth the penalty of punitive damages was not established. . . .''

In *Roche* v. *Casissa, supra,* the court said at page 788: ''. . . Although the code sections (Civ. Code, § 3346, and Code Civ. Proc., § 733) do not in terms condition the award upon wilfulness or malice, recovery of treble damages cannot be had except upon such showing . . . What constitutes wilful or malicious conduct under this rule has not been spelled out

in California decisions. An indication is given by Civil Code, section 3346, which provides treble damages for wrongful injuries to trees 'except where the trespass was casual and involuntary, or committed under the belief that the land belonged to the trespasser.' "

In that case the court held that there was evidence that the appellant knew the trees were not on his land, yet disregarded rights of the adjoining owner and cut the trees for the sole purpose of improving the view from his home. It was held that such evidence supported a finding that the acts were wilful and wanton and that the award of treble damages was well within the discretion of the trial court.

In the Roche case the court said at page 788: "In general, the question of what circumstances warrant award of exemplary damages under these sections is committed to the sound discretion of the trial court (*Swall* v. *Anderson,* 60 Cal.App.2d 825 [141 P.2d 912]). Where there is a real question as to plaintiff's title and defendant has a right to remove substantial parts of the trees because they extend over his land, an award of more than actual damage will be reversed (*Fick* v. *Nilson,* 98 Cal.App.2d 683 [220 P.2d 752]). Where plaintiff's title is clear and is known to defendant, award of treble damages is within the discretion of the trial court (*Mosesian* v. *Danielian,* 52 Cal.App.2d 387 [126 P.2d 363]; *Butler* v. *Zeiss,* 63 Cal.App. 73 [218 P. 54])."

■ The above cases clearly lay down the rule, without conflict, that treble damages may only be awarded when the wrongdoer intentionally acted wilfully or maliciously. The intent required is the intent to vex, harass, or annoy or injure the plaintiff. It is a question of fact for the trial court whether or not such intent exists. In *Fick* v. *Nilson, supra,* it was held that where the uncontradicted evidence indicated that plaintiff's title was confused, the defendant had permission from the prior owner to cut the trees, the real damage was being done to defendant's land, and that defendant acted in a way he believed to be rightful and not harmful, then as a matter of law the defendant's act was not wilful or malicious. In that case the facts were uncontroverted and clear, and thus the appellate court could find nothing in the record to support the lower court's judgment. In Roche, *supra,* although the appellant suggested that the land was owned by a church which would not object to his cutting the trees, he had no direct authorization from the church and made no real effort to determine title. It was certain that he cut the trees wil-

fully, disregarding the rights of the owner, and for the sole purpose of improving the view from his house. In *Fick, supra,* there was no evidence of bad faith, and in the Roche case it was apparent that the trial court could properly draw such an inference. ▮ In the present case the trial court found that the defendants' acts were not in bad faith; that defendants' motives were not to vex, harass, annoy or injure the true owners; and that the trespass of the defendants was done for the purpose of harvesting what they thought was their own. This conclusion was supported by the record, which shows the contract in 1949 giving Thompson and Edsell the right to cut the timber. The evidence is clear that defendants construed the contract differently than this court did in *Crofoot Lumber, Inc.* v. *Thompson,* 163 Cal.App.2d 324 [329 P.2d 302]. Here there was an issue as to the title upon which legal minds could at that time well differ. Under such circumstances it may not be said that defendants were charged with knowledge of plaintiff's title. (*Abbott* v. *'76 Land & Water Co.,* 103 Cal. 607, 609 [37 P. 527].) ▮ Also, the granting of treble damages is within the sound discretion of the trial court and failure to so provide will not be reversed except upon a clear showing of abuse. (*Swall* v. *Anderson, supra.*) ▮ The trial court did not err in holding that treble damages were not applicable in this case.

▮ Crofoot next contends that if it is not entitled to treble damages under the provisions of section 3346 of the Civil Code, then its damages should have been assessed at twice its actual damage as provided in the section as amended in 1957. (Stats. 1957, ch. 2346.) The trespass and resulting damages in this case all occurred prior to 1957. The section prior to its reenactment in 1957 did not provide for double damages. The double damage feature of the statute imposed a liability which did not exist prior to its reenactment in 1957. The provision is penal and not retroactive. Hence there is no merit in this contention. (*Helm* v. *Bollman,* 176 Cal.App.2d 838 [1 Cal. Rptr. 723], hearing denied by the Supreme Court.)

▮ Crofoot next contends, in the alternative, that if it is not entitled to damages under section 3346, it would be entitled to damages under its theory of conversion and that said damages should be measured by the amount of money received by the defendants for the property together with interest from the date of conversion. We feel that there is merit in this contention.

The trial court found that "the stumpage value of timber so removed by defendant DON FORD was $105,945; that is $25 per M for redwood and $19 per M for fir." In addition, it further found that "In so cutting said timber, loggers employed by DON FORD damaged plaintiff's freehold in the amount of $500." The evidence amply supports these findings.

Crofoot contends that the respondents should not be allowed to keep their profit which was the result of their wrongful marketing of the trees as lumber, since the trial court found that the respondents converted the timber to their own use. Such a theory is available in California under the facts of this case. (*Halleck* v. *Mixer*, 16 Cal. 574, 578.) Civil Code, section 3336, provides that compensatory damage is the value of the property at the time of the conversion, with interest from that time. Interest should have been awarded in this case and the trial court erred in this respect.

The law generally upon the correct measure of the value of the timber, or the compensatory damage to be recovered under the fact situation in this case, is confused. As stated in *Trustees of Dartmouth College* v. *International Paper Co.*, 132 F. 92, 97: "In theory the allowance should equal the cost of the defendant's improvement, not to exceed the consequent enhancement of value in the property converted. But sometimes the plaintiff has been limited to the recovery of (a) stumpage, or, in the case of coal, of reasonable royalty [citing cases]; sometimes (b) the value after severance, less expense of severing [citing case]; sometimes (c) stumpage plus profit [citing cases]; sometimes (d) value at severance, less what it would have cost the plaintiff to sever [citing case]; sometimes (e) value at time of action brought, or at some other time after severance, less expense of improvement [citing cases]; sometimes (f) value immediately after severance, on the theory that there can be no conversion of chattels until after severance from the realty [citing cases]; sometimes (g) value when removed from plaintiff's land, because the conversion is not deemed complete until then [citing cases]; sometimes (h) defendant's profit received [citing cases]; sometimes (i) value at time of action brought, or at some other time after severance, less value added by defendant [citing cases]. . . ."

McCormick in his Handbook on the Law of Damages (1935 ed.) makes this comment at page 492: "If the wrong complained of is . . . the cutting of them [plaintiff's trees] by the defendant and his appropriation of the timber, then, if

the defendant's depredation was done under an innocent mistake as to boundary or ownership, he will usually be held in an action in the nature of trespass to the land, as in the cases . . . of negligent injury to the timber by fire or the like, only for the diminished value of the land or the value of the trees before cutting. This hardly seems an adequate measure of relief to a plaintiff who intended to market his trees, not by selling them as standing timber, but by cutting them and selling them as logs or lumber.'' McCormick cites with approval *Green* v. *Southern Timber Co.*, 291 F. 582, 584, where it was said: ''Reckoning the damage on the basis of stumpage would be to disregard the unwillingness of the owner to sell. The defendant was a trespasser, even though unwittingly. Surely he should be content to forego any profit. . . .''

California cases in analogous situations tend to support the foregoing view. In *Wolfsen* v. *Hathaway, supra* (a case concerning growing crops), the distinction between the measure of damage for the destruction of annually planted crops and perennial crops was pointed out. The proper measure of damage for the wrongful destruction of perennial crops is the difference in rental value of the land with and without the crops. Damage for destruction of annual crops is the market value of the estimated product at the time of destruction, less the cost of producing and marketing the crops. ▉ In the instant case the timber was a marketable product, and it seems reasonable to us that damage should be determined on the basis of market value, less the reasonable and necessary cost of marketing, the same as with annual crops, i.e., the expense of harvesting, cutting, hauling and delivering the logs to the mill where they were sold. It is no answer to argue that trees are perennial crops, for the true distinction is upon the basis of whether or not the crops are raised to be harvested or raised to be used on the land. This is clearly indicated in *Wolfsen* v. *Hathaway, supra,* where, after discussing the rule set out above, the court held that in that case where a lease of land for pasturage gave the lessees the right to *harvest* volunteer grass (a perennial crop), the lessees were entitled to recover the market value of the grass, less the cost of cutting and hauling it to market, as damages for its wrongful destruction.

In *Ehrhart* v. *Bowling,* 36 Cal.App.2d 503 [97 P.2d 1010], a case involving the conversion of gold from a mine, the court held to be proper the instruction of the trial court that the

measure of damages would be the value of the mineral extracted from the ore, less the cost of production, if the mine was invaded as a result of an honest mistake and inadvertence. The same measure was said to be correct in *Lightner Mining Co.* v. *Lane,* 161 Cal. 689 [120 P. 771, Ann. Cas. 1913C 1093], and *Union Oil Co.* v. *Reconstruction Oil Co.,* 20 Cal. App.2d 170 [66 P.2d 1215].

We are of the opinion that Crofoot's recovery should not have been limited to the stumpage value of the timber converted. Moores and Smith was, as stated, a copartnership. Moores owned 43.8 per cent of the capital stock of Garcia Loggers and 46.4 per cent of the capital stock of Hollow Tree Lumber Company. William Smith owned 43.8 per cent of the stock of Garcia Loggers and 45.7 per cent of the capital stock of Hollow Tree Lumber Company. Moores was president and a director of Hollow Tree Lumber Company and secretary and a director of Garcia Loggers. Smith was a vice president and director of each corporation. The various companies were created for tax purposes. As Moores testified: ". . . The provisions of the internal revenue code allow timber to be held in separate ownership from the companies that produce the timber and sell it. They also allow logging to be performed by separate companies. They recognize and have returns that are filed on a division of income which can properly be put in one company or several companies. We put ours in several companies." Crofoot should be allowed to recover the profit made by the Moores and Smith group in addition to the value of the timber. Any other result would permit the trespassers to profit from their wrong. Crofoot's recovery should have been the market value of the lumber manufactured less the reasonable costs incurred in the manufacture. The amount recovered, however, should in no event be less than the stumpage value of the timber, plus interest from the date of conversion.

Turning now to the appeal of cross-complainants, William Moores and William Smith, individually and doing business as Moores and Smith, a copartnership, from that part of the judgment denying them relief on their cross-complaint against the cross-defendants, Jack Lewis, Austin Rawles and Henry Thompson, the record discloses that Moores and Smith filed a cross-complaint against the above-named cross-defendants and one Passalacqua, wherein they alleged that cross-defendants Lewis, Rawles and Thompson covenanted with and warranted to cross-complainants that they had and would convey

good title to the timber. The trial court found that Lewis, Rawles and Thompson did not warrant title to the timber to Moores and Smith. It further found that in the contract between Moores and Smith on the one side and Lewis, Thompson and Rawles on the other side, Moores and Smith sought to obtain, but Lewis, Rawles and Thompson refused to give, an agreement to indemnify Moores and Smith against any loss or liability arising out of the cutting of the timber, and for that reason concluded that Moores and Smith were not entitled to indemnity.

The finding of the trial court is amply supported by the evidence and such evidence was properly received by the trial court. Section 1791 of the Civil Code provides: "Where any right, duty or liability would arise under a contract to sell or a sale by implication of law, it may be negatived or varied by express agreement or by the course of dealing between the parties, . . . ."

This provision is section 71 of the Uniform Sales Act. The identical provision was interpreted in *Alex J. Mandl, Inc.* v. *San Roman*, 170 F.2d 839. The court said at page 841: "Under the Uniform Sales Act, which is in force in Illinois, it is provided by Section 71, Ill. R.S. 1947, c. 121½, sec. 71, that 'where any right, duty or liability would arise under a contract to sell or a sale by implication of law, it may be negatived or varied by express agreement or by the course of dealing between the parties, or by custom, if the custom be such as to bind both parties to the contract or the sale.' This is merely declaratory of the common law. *Christian Mills* v. *Berthold, Stern Flour Co.*, 247 Ill.App. 1. The Supreme Court of Illinois in *Sterling-Midland Coal Co.* v. *Great Lakes Coal & Coke Co.*, 334 Ill. 282, at page 290 [165 N.E. 793, 797], held that where the parties have by express terms negatived implied warranties, the purchaser 'cannot claim the benefit of any such as might have been available had the contract not done so.' See also *Heller* v. *Franklin-Butler Motors, Inc.*, 259 Ill.App. 358. According to Williston a complete negation of a warranty occurs when there exist, 'any words or conduct tending to show that such was the intention of the parties.' Williston on Sales (2d Ed.), Section 239. 'Any words or conduct tending to show that this was the intention of the parties will prevent a warranty from being implied.' . . ."

It is clear that under the Uniform Sales Act evidence of the course of dealing between the parties may be received

to negative a warranty implied by law. The case of *Calpetro Producers Syndicate* v. *Chas. M. Woods Co.*, 206 Cal. 246 [274 P. 65], which cross-complainants rely upon, was decided before section 71 of the Uniform Sales Act was incorporated into California law. The rule enunciated in the Calpetro case that oral testimony to negative a warranty implied in law may not be received is no longer controlling because a specific statute now permits such testimony.

The cross-complainants also contend that the cross-defendants impliedly warranted title by ratification and acceptance of benefits from the sale, and further that since the Moores group relied upon this implied in fact warranty the cross-defendants are estopped to deny the warranty. This is clearly a factual issue and a question of which side is to be believed. There is evidence that the Moores group were at all times fully aware of the condition of the cross-defendants' title and participated in the proceeding brought by Crofoot to enjoin removal of the timber. Therefore, there was substantial evidence of knowledge and thus no bona fide reliance by the Moores group.

The judgment in favor of Crofoot Lumber, Inc., is reversed insofar as it relates to the measure of damages awarded.

It is further ordered that insofar as the judgment relates to William Moores and William Smith, individually, and as copartners doing business under the name of Moores and Smith, on their cross-complaint against Jack Lewis, Austin Rawles and Henry Thompson the judgment is affirmed.

Van Dyke, P. J., and Schottky, J., concurred.