[Civ. No. 24227.   First Dist., Div. Four.   Sept. 29, 1967.]

EARLE E. NEWHART et al., Plaintiffs and Appellants, v. C. C. PIERCE et al., Defendants and Appellants.

.Hochman & Salkin, Avram Salkin and Harvey D. Tack for Plaintiffs and Appellants.

Alef & Schnitzer and Martin J. Schnitzer for Defendants and Appellants.

CHRISTIAN, J.—Plaintiffs sued for breach of contract to purchase a ranch, for conversion of 1,392 head of cattle, and for fraud, all in connection with a single transaction for the sale of a Nevada cattle ranch. After a nonjury trial, plaintiffs took a judgment of $20,425 for defendants' breach of contract. The court found against defendants on their cross-complaint for breach of two subsidiary contracts in which plaintiffs had agreed to sell $70,000 worth of cattle to defendants. Defendants appeal from the entire judgment,[1] and plaintiffs appeal from those portions of the judgment (1) limiting damages in the breach of contract action to $20,425, (2) denying interest from the date of breach to the date judgment was entered, and (3) denying recovery on plaintiffs' causes of action for conversion and fraud. We reverse those portions of the judgment awarding plaintiffs damages for

---

[1]Defendants did not prosecute their appeal from the judgment against them on their cross-complaint.

breach of contract and denying recovery to plaintiffs for conversion.

## The Facts

Plaintiffs, residents of Los Angeles, were the owners of a 1,060-acre ranch near Tonopah, Nevada, stocked with more than 1,400 head of mature cattle. Plaintiffs also enjoyed grazing rights in 400,000 acres of federal range land. On April 29, 1957, defendants contracted to purchase the ranch, together with all its cattle, equipment, and grazing rights for $265,000. The contract was soon amended by written escrow instructions, which provided for the sale of (1) 1,442 head of cattle for $93,500, payable in cash on or before June 1, 1957, and (2) the ranch for $171,500, payable on or before the same date, as follows: a 5 percent promissory note in the amount of $155,000, secured by a deed of trust on the ranch; a note in the face amount of $21,227.89, valued by the parties at $16,500, secured by a deed of trust on a certain filling station. The closing date for the escrow was extended to July 1, 1957.

When it became apparent that defendants could not raise the $93,500 purchase price for the cattle, defendant C. C. Pierce informed plaintiff Dr. Newhart that the Farmers Home Administration would make a $40,000 loan to help finance the transaction if Pierce could show an option to purchase specific cattle. The Newharts agreed to cooperate to that end. However, the cattle were already under a lien to the Nevada Livestock Production Credit Association (hereinafter P.C.A.), securing a debt owed by plaintiffs. In order to give security for the desired Farmers Home Administration loan and pay off the debt to the P.C.A., the parties devised a plan by which plaintiffs would give a bill of sale for the cattle to defendants when the cattle were gathered and counted. The "bill of sale" was intended to enable Pierce to induce the Farmers Home Administration to loan money. The parties then agreed that possession of the ranch was to be transferred to defendants after the P.C.A. loan had been paid off and that the Pierce-Newhart note in the amount of $155,000 would be paid as soon as defendants could sell a California ranch which they owned.

Also in furtherance of this scheme, the parties signed options, dated May 19, 1957, purportedly entitling defendants to purchase $70,000 worth of cattle at the following prices: cow-calf pairs, $90; dry cows, $70; yearlings, $50; bulls, $130. These options, however, were not supported by any consideration.

Defendant C. C. Pierce took some cowhands to the ranch and began to round up cattle; by June 7, 1957, he began shipping cattle to his California ranch. Because plaintiffs were not living on the ranch they did not immediately learn what was happening. But on June 7, Dr. Newhart was informed by a third party that cattle were being removed; believing Pierce was stealing the cattle, Newhart immediately requested the sheriff of Nye County to stop the trucks. The following day the parties met in Tonopah. After heated discussions, Dr. Newhart, in an attempt to salvage the intended sale of the ranch and cattle, agreed to allow defendants to ship 661 head away from the ranch, depending upon the approval of the Farmers Home Administration and P.C.A. Plaintiffs were to give defendants a bill of sale for these cattle concurrent with receipt of $40,000 as the proceeds of a loan from Farmers Home Administration.

In a bill of sale dated June 8, 1957, plaintiffs acknowledged the receipt of checks totaling $47,470 from defendants in payment for 200 cow-calf pairs, 241 dry cows, 200 yearlings, and 20 bulls (661 head, excluding calves). This instrument recited that the sale of these cattle was not connected with the sale of cattle provided for in the escrow instructions.

On the same day, the parties executed a document entitled "Amendment to Escrows" which provided that:

(1) The number of cattle to be delivered to defendants was reduced from 1,442 to 711.

(2) Defendants were to pay plaintiffs and the P.C.A. $23,000 within 10 to 14 days. This sum was to be realized "as proceeds from cattle expected to be gathered in this period."

(3) Defendants were to execute by June 14, 1957 the notes called for in the escrow instructions.

(4) The parties were to share the responsibility of paying the amount due on a certain prior secured obligation.

(5) Defendants were to receive bills of sale for the cattle from time to time as checks for the purchase price cleared.

(6) Bills of sale were to be given only for brand-inspected cattle. A final count was to be conducted by October 15, 1957 (the fall roundup), at which time defendants were to pay plaintiffs at agreed rates for all livestock left on the ranch.

(7) Defendants were to take over the operation of the ranch when the P.C.A. was paid in full.

A brand inspection and cattle count made in the course of shipment showed that the defendants in fact removed 557 cows, 229 yearlings, 253 calves, and 29 bulls (815 head,

excluding calves) from the ranch between June 7 and June 24, 1957. Defendants paid $100 into escrow, $47,470 directly to plaintiffs, and $9,040 to the P.C.A. for the credit of plaintiffs. The court found that defendants failed to perform any other of their obligations to plaintiffs, and concluded that plaintiffs were entitled to recover for breach of contract. For the purposes of fixing damages, the court determined that the fair market value of the ranch as of July 1, 1957 was $150,000 and that the contract price was $171,500. Plaintiffs had sold the ranch and remaining cattle in January 1959 for a stated consideration of $95,000. Because plaintiffs would have been required to pay a 5 percent brokerage commission under the escrow instructions, damages for breach of the contract were determined to be $20,425 (contract price, less fair market value, less brokerage commissions saved by plaintiffs).

The court also found that plaintiffs only authorized defendants to remove 200 cow-calf pairs, 241 dry cows, 200 yearlings and 20 bulls (661 head exclusive of calves). It further found that defendants in fact removed 557 cows, 253 calves, 229 yearlings, and 29 bulls (815 head exclusive of calves) but paid the full contract price for all the livestock taken. Upon these findings the court concluded that defendants did not convert plaintiffs' cattle.

Finally, the court found that defendants had intended to perform their written promises to plaintiffs, made no material misrepresentations, and were thus not chargeable with fraud.

On appeal, defendants contend that the evidence was insufficient to support the finding that the ranch had a fair market value of $150,000 on the date of breach. Plaintiffs contend that the trial court erred in failing to find that defendants converted the cattle and in failing to award interest from July 1, 1957, the date of breach.

### Defendants' Appeal

The measure of damages for breach of contract to purchase real property is the amount by which the contract price exceeds the value of the property to the seller on the date of breach. (Civ. Code, § 3307; *Allen* v. *Enomoto* (1964) 228 Cal. App.2d 798, 803 [39 Cal.Rptr. 815]. The opinions of Dr. Newhart and an expert real estate appraiser called by defendants, and testimony of Dr. Newhart regarding the price obtained by him for the ranch and the remaining cattle upon a later sale to a third party, are the only evidence bearing on the value of the ranch on the date of breach. The question to be decided on appeal is whether there was sufficient evidence to support the

trial court's finding that the value of the ranch on the date of breach was only $150,000. We have determined that there was not.

### The Owner's Opinion of Value

■ The owner of real or personal property may competently testify to its value. (*Holt* v. *Ravani* (1963) 221 Cal. App.2d 213, 215 [34 Cal.Rptr. 417]; *Harold* v. *Pugh* (1959) 174 Cal.App.2d 603, 609 [345 P.2d 112].) Dr. Newhart gave his opinion that the ranch was valued at $300 to $350 per animal unit.[2] Since the ranch was considered to represent 775 animal units, its gross value would range from $232,500 to $271,250. At this point in the trial, the evidence was insufficient as a matter of law to support plaintiffs' claim that they suffered damages from defendants' failure to perform. But when asked if $271,250 was the value of the ranch on May 1, 1957, Dr. Newhart stated, "I think that—by value, if you mean what can you get for it, I think that's a little high." He then noted that the ranch was a "bare ranch," which would be worth much less than the same ranch with cattle on it. "Cattle validate the ranch and make it a more valuable thing." Then Dr. Newhart testified that the value of the ranch was "$150,000 probably; I am just guessing." He next gave the opinion that the fair market value of the ranch and the cattle was "a little bit higher" ($275,000) than the total contract price of $265,000, and "we were willing to sell it for somewhat less than its actual value just to consummate the deal." As we shall demonstrate, the value of the cattle was equal to the contract price of $93,500. But if the ranch alone had been worth $150,000 as Dr. Newhart guessed, then the cattle would have been worth $115,000: an overevaluation of $21,500, as we know from the trial court's findings, based on overwhelming evidence, concerning the value of the cattle. It follows that the $150,000 "guess" represented an underevaluation of the ranch by $21,500, and its true value was exactly the contract price of $171,500. Moreover, Dr. Newhart's guess that the value of the ranch was $150,000 was qualified by his statement that this was the depreciated value after defendants had removed 815 head of cattle, exclusive of calves, from the ranch. But this answer was in response to questions regarding the value of May 1, 1957, over a month before the first cow was removed and two months before the date of breach. The

---

[2]An animal unit is the capacity to carry one mature animal for one year. This unit is commonly used in valuation of cattle ranches.

value of the ranch is to be determined as of the date of breach. (*Allen* v. *Enomoto, supra,* 228 Cal.App.2d 798, 803.)

### The Opinion of Defendants' Expert

Defendants' expert, a real estate appraiser familiar with cattle ranches in the Tonopah, Nevada area, testified that the ranch was worth $300 to $325 per animal unit in May and June 1957. Since he had been instructed to assume, consistent with Dr. Newhart's testimony, that the ranch had 750 to 775 animal units, his testimony produces values ranging from $225,000 to $251,875, or only from $7,500 to $19,375 less than the values originally given by Dr. Newhart.

### The Later Sale as Evidence of Value

Both before and after the date of breach, plaintiffs listed the ranch for sale with a broker for $183,000, the "hoped for sales price." Finally, in January 1959, plaintiffs succeeded in transferring the ranch and remaining cattle (230-plus head had been counted on July 15, 1957, and no cattle were removed between that date and January 1959) in exchange for property which in Dr. Newhart's opinion was worth $95,000. This property was a used car lot, a "small older house," two reject thoroughbred horses, and possibly $20,000 in cash. The house was given to the broker as his commission. Plaintiffs did not produce any evidence of the value of the items for which the ranch was exchanged other than Newhart's own vague and indefinite estimates.

The findings of the trial court must be sustained if there is any substantial evidence, whether contradicted or not, which supports them. But to support a finding the evidence must be substantial. (*Primm* v. *Primm* (1956) 46 Cal.2d 690, 693 [299 P.2d 231]; *Estate of Teel* (1944) 25 Cal.2d 520, 526 [154 P.2d 384]; *Estate of Bishop* (1962) 209 Cal.App.2d 48, 53 [25 Cal.Rptr. 763].) "The test, of course, is not whether there is a substantial conflict in the evidence but whether there is substantial evidence in favor of [plaintiff]." (*Crogan* v. *Metz* (1956) 47 Cal.2d 398, 404 [303 P.2d 1029]; *Krause* v. *Apodaca* (1960) 186 Cal.App.2d 413, 418-419 [9 Cal.Rptr. 10]; cf. *Estate of Bishop, supra,* at p. 54.)

Substantial evidence "must be of ponderable legal significance. Obviously the word cannot be deemed synonymous with 'any' evidence. It must be reasonable in nature, credible, and of solid value; it must actually be 'substantial' proof of the essentials which the law requires in a particular case." (*Estate of Teed* (1952) 112 Cal.App.2d 638, 644 [247

P.2d 54]; *Estate of Bishop, supra,* 209 Cal.App.2d · 48, 53.) ■■■ A finding cannot be based on guesses, conjectures, or on mere speculation. (*San Bernardino Valley Water Dev. Co. v. San Bernardino Valley Mun. Water Dist.* (1965) 236 Cal.App.2d 238, 257 [45 Cal.Rptr. 793].) The burden of proving damages rested on plaintiffs. Dr. Newhart's testimony that the ranch was worth $150,000 was stated by him as a mere guess; it was therefore unsubstantial. (*San Bernardino Valley Water Dev. Co. v. San Bernardino Valley Mun. Water Dist., supra.*) We must look beyond the mere form of his statement and consider whether it derives substance from the context or the surrounding circumstances. Immediately preceding his speculative testimony on value, Dr.Newhart had testified that, on the basis of value per animal unit, the value of the ranch exceeded the contract price. Shortly after he made the $150,000 "guess," he testified that the value of the ranch and cattle together exceeded the contract price by $10,000. In view of the fact that the evidence we shall review below clearly establishes that the contract price of the cattle alone equaled the value of the cattle, it inescapably follows that if we accept this particular statement of value given by Newhart, the contract price of the ranch alone exceeded the value of the ranch by $10,000. Thus Newhart's self-contradicted and improbable guess that the value of the ranch was $150,000 on the date of breach cannot support an award of damages.

We turn to the transfer of the ranch one and one-half years after the date of breach for a stated consideration of $95,000. ■■■ Later sales of the same realty provide evidence of the fair market value at the time of breach. (*Bagdasarian v. Gragnon* (1948) 31 Cal.2d 744, 758 [192 P.2d 935].) Of course, the possibility that the character or value of the property may have changed during the interim must be considered and goes to the weight of this kind of evidence. (*Los Angeles County Flood etc. Dist. v. McNulty* (1963) 59 Cal.2d 333, 337 [29 Cal.Rptr. 13, 379 P.2d 493]; *Royer v. Carter* (1951) 37 Cal.2d 544, 548-549 [233 P.2d 539]; 1 Witkin, Summary of Cal. Law, Contracts, § 290, pp. 318-319.)

The only evidence derived from the later sale, which might tend to support the trial court's finding, was Dr. Newhart's testimony that "The sales price, I think was $95,000." But his testimony concerning the actual consideration received by him was that the house ("a very poor house in a poor area") might have been worth $5,000 and that he thought he had

received $20,000 cash, although he could not remember with certainty. He was unable to place any value on the used car lot and could not remember other highly relevant details of the transaction. The horses were traded for other horses, not for the ranch itself. Evidence of the price obtained upon resale of the property, even if established with certainty, is admissible only as an indication of its likely value on the date of breach. For the purpose of showing such value, we do not in this case regard the evidence of resale price as substantial; it was vague and uncertain, and it was contradicted by other statements of the same witness. (See *Camp* v. *Ortega* (1962) 209 Cal.App.2d 275, 281-283 [25 Cal.Rptr. 837].) We distinguish *Royer* v. *Carter, supra,* 37 Cal.2d 544, and *Bagdasarian* v. *Gragnon, supra,* 31 Cal.2d 744, where the question was the admissibility, rather than the substantiality, of evidence of later sales.

Where (a) the contract price is not excessive and (b) there is no decline in the market before the resale date, it follows that the contract price and value on the date of breach are the same. (See *Fleischer* v. *Cosgrove* (1956) 145 Cal.App.2d 14, 17-18 [301 P.2d 911].) According to Dr. Newhart's own testimony, the contract price was not excessive. Furthermore, according to the evidence, the market either remained steady or rose slightly between the dates of breach and resale. ▮ Thus we find in the record no substantial evidence to contradict the strong indications we have pointed out that the value of the ranch at the date of breach either exceeded the contract price by a considerable amount, or was the same as the contract price. There can be no damages where the value to the owner equals or exceeds the contract price. (Civ. Code, § 3307.)

### *Plaintiffs' Appeal*

Plaintiffs' first contention is that the trial court erred in failing to award interest from the date of breach. Having concluded that plaintiffs are not entitled to recover any damages for breach of the contract to purchase the ranch, we need not consider this contention. Plaintiffs' briefs do not mention their cause of action for fraud. The only question remaining is whether the trial court erred in failing to award damages for defendants' alleged conversion of plaintiffs' cattle.

▮ Conversion is " 'an act of wilful interference with a chattel, done without lawful justification, by which any person entitled thereto is deprived of use and possession.' (Prosser on Torts, 2d ed., p. 66; . . .)" (*de Vries* v. *Brum-*

*back* (1960) 53 Cal.2d 643, 647 [2 Cal.Rptr. 764, 349 P.2d 532]; *Bufano* v. *City & County of San Francisco* (1965) 233 Cal.App.2d 61, 68 [43 Cal.Rptr. 223].) The trial court found that plaintiffs authorized defendants to remove only 661 head of cattle from the ranch. A further finding recites that defendants in fact removed 815 head, but paid the full contract price for the cattle taken. The court thereupon concluded that defendants did not wrongfully convert any of plaintiffs' cattle. ■ There can have been no conversion of the 661 head removed with Dr. Newhart's permission, because defendants had a lawful justification. (*Klett* v. *Security Accept. Co.* (1952) 38 Cal.2d 770, 789-790 [242 P.2d 873].) As to the remaining cattle taken, the evidence most favorable to defendants was that they were acting under the mistaken belief that the "options" to purchase were enforceable. The trial court found, however, that defendants gave no consideration for these options. This finding is based on substantial evidence. ■ Defendants' mistaken belief that they were acting under a valid contract is no defense to a cause of action for conversion. "Neither good nor bad faith, neither care nor negligence, neither knowledge nor ignorance are the gist of the action." (*Bufano* v. *City & County of San Francisco, supra,* 233 Cal.App.2d 61, 68; *McAllister* v. *Metzger* (1963) 220 Cal.App.2d 692, 706-707 [33 Cal.Rptr. 879].) A taking clouded by mistake is no less a wrongful taking. (See *Butler* v. *Collins* (1859) 12 Cal. 457, 459.) The wrongful exercise of dominion over another's personal property is the gist of the action. (*Pope* v. *National Aero Finance Co.* (1965) 236 Cal.App.2d 722, 731 [46 Cal.Rptr. 233].)

■ Upon analysis of the evidence, we cannot sustain the finding that defendants paid the full contract price for the cattle taken. The two checks totaling $47,470 paid by defendants represent the contract price for the 661 head sold by plaintiffs under the contract.[3] In addition, defendants paid

---

[3]Defendant C. C. Pierce testified that the option prices were the contract prices. This is borne out by applying those prices to the 661 head of cattle as follows:

| Type of Cattle | Number | Option Price | Value |
|---|---|---|---|
| Wet cows | 200 | $90. | $18,000. |
| Dry cows | 241 | 70. | 16,870. |
| Yearlings (mixed) | 200 | 50. | 10,000. |
| Bulls | 20 | 130. | 2,600. |
| Total | 661 | | $47,470. |
| | | Contract Price | $47,470. |

The option or contract prices for the 1,442 head mentioned in the

$9,140 to plaintiffs' credit. The fair market value, based on the contract prices of the 154 head removed without plaintiffs' consent was $11,800.[4]  Thus, data in the findings themselves, supported by the evidence, show that defendants removed without authorization $11,800 worth of cattle for which only $9,140 was paid. The difference in value is $2,660.

Damages for conversion are defined by statute: "The value of the property at the time of the conversion, with interest from that time, or, an amount sufficient to indemnify the party injured for the loss which is the natural, reasonable and proximate result of the wrongful act complained of and which a proper degree of prudence on his part would not have averted; . . ." (Civ. Code, § 3336.)

Plaintiffs assert that the damages here should include profits of $30,000 to $65,000 made by defendants upon resale of the cattle. In exceptional circumstances, to avoid injustice, loss of profits may be the measure. (*Crofoot Lumber, Inc.* v *Ford* (1961) 191 Cal.App.2d 238, 247-249 [12 Cal. Rptr. 639].) There was no evidence, however, showing what proportion of these alleged profits were attributable to the resale of the 154 head actually converted. Defendants, furthermore, resold many of the cattle after a year of fattening them on their own ranch. Thus the proper measure of damages here is the value of the property at the time of the conversion plus interest. (*Service* v. *Trombetta* (1963) 212 Cal.App.2d 313, 316 [28 Cal.Rptr. 68]; *Everfresh, Inc.* v. *Goodman* (1955) 131 Cal.App.2d 818, 820 [281 P.2d 560].) Of course, credit must be allowed, in computing damages, for the $9,140 already paid. (Prosser, Torts (3d ed. 1964) § 15, p. 97.)

Code of Civil Procedure section 956a authorizes this court to make findings of fact contrary to, or in addition to,

escrow instructions totaled $93,460, only $40 less than the escrow price of $93,500. That the contract prices were approximately the same as the fair market value at the time of the alleged conversion was demonstrated by defendant C. C. Pierce's testimony, by market reports, and by the testimony of a stockyard official.

[4]The findings and exhibits show that plaintiffs removed without authorization 63 dry cows, 53 cows with calves, 29 yearlings, and 9 bulls. Applying the contract prices to these 154 head of cattle, we establish that their value is $11,800, as follows:

| Type of Cattle | Number | Option Price | Value |
|---|---|---|---|
| Wet cows | 53 | $90. | $ 4,770. |
| Dry cows | 63 | 70. | 4,410. |
| Yearlings | 29 | 50. | 1,450. |
| Bulls | 9 | 130. | 1,170. |
| Total | 154 | | $11,800. |

those made by the trial court where trial by jury has been waived. "Such findings may be based on the evidence adduced before the trial court either with or without the taking of evidence by the court of appellate jurisdiction, . . ." (Code. Civ. Proc.,§ 956a.) "The purpose of section 956a is to enable appellate courts, in appropriate cases, to terminate litigation by affirmance, or modification and affirmance, of the judgment, or by reversal with directions to enter judgment for appellant if it appears that on no reasonable theory could respondent make a further showing in the trial court." (*People* v. *Benford* (1959) 53 Cal.2d 1, 6 [345 P.2d 928]; see *Crofoot Lumber, Inc.* v. *Lewis* (1962) 210 Cal.App.2d 678, 681 [27 Cal.Rptr. 443].)

Using the evidence adduced at the trial, we find that defendants without plaintiffs' permission took, and withheld without payment therefor, 154 head of plaintiffs' cattle and that plaintiffs suffered a detriment of $2,660 thereby. We further find that the date of the conversion was June 14, 1957.[5] Defendants are entitled to seven per cent interest from that date.

The judgment awarding plaintiffs damages for breach of contract is reversed. The judgment denying plaintiffs damages for conversion is reversed with directions to enter judgment awarding plaintiffs damages in the sum of $2,660, plus 7 percent interest from June 14, 1957. Each party shall bear his own costs.

Devine, P. J., and Rattigan, J., concurred.

A petition for a rehearing was denied October 27, 1967, and the petition of the plaintiffs and appellants for a hearing by the Supreme Court was denied November 22, 1967.

---

[5]Although the cattle were shipped by defendants on June 7, 13, 14 and 24, we consider the converted cattle to have been the last cattle shipped. No bulls were shipped after June 14.