[Civ. No. 20387. First Dist., Div. One. Jan. 14, 1963.]

J. C. CALDWELL et al., Plaintiffs and Respondents, v. KENNETH W. WALKER et al., Defendants and Appellants.

Falk & Falk and Charles E. Buxton, Jr., for Defendants and Appellants.

Mitchell & Henderson for Plaintiffs and Respondents.

SULLIVAN, J.—In this action for damages for the cutting, logging and removal of timber, the sole question for our determination is whether the evidence is sufficient to justify an award of treble damages in favor of the plaintiffs. The plaintiffs J. C. Caldwell, hereafter referred to as Caldwell, and Rachel V. Caldwell are husband and wife. The defendants Kenneth W. Walker, hereinafter referred to as Walker, and Virginia A. Walker are also husband and wife.

Caldwell was a rancher and was also engaged in the timber business. For a number of years he owned a 1,300-acre ranch in Humboldt County known as the Caldwell Ranch. Adjoining it was a 1,000-acre ranch known as the Jameson Ranch. The owner of the Jameson Ranch in 1953 was one Verna Robertson who had been adjudicated an incompetent. Roy Jameson, her son, was the guardian of her person and estate.

On April 8, 1953, Roy Jameson as such guardian and Mr. and Mrs. Walker entered into a written contract for the sale and logging of "all of the remaining standing, and down merchantable timber" on the Jameson Ranch. By its terms the contract was to expire on April 8, 1956. However it was never approved by the superior court having jurisdiction over the Robertson guardianship. In addition, it was never re-

corded. At the time the above contract was entered into, Caldwell knew generally that the parties thereto had reached an agreement with respect to logging the Jameson timber, although he never acquired full and precise information of its form, contents or duration. It appears that Caldwell and Walker at one time had been close friends and that the Walkers had formerly done logging for Caldwell. It was as a result of Caldwell's introducing Walker to Roy Jameson that the last-named parties entered into the contract in question.

Shortly after signing the above contract, Walker commenced logging operations on the Jameson Ranch and continued with them until July 1954. From the start he had trouble obtaining a right-of-way into the property. During part of the time he was able to make arrangements of a temporary nature with Caldwell to use the road through the Caldwell Ranch. Later and in conjunction with Jameson, he tried to secure, by legal action, a right-of-way over the lands of one Conroy. When these efforts failed, Walker ceased operations in July 1954.

In 1955 Verna Robertson, the owner of the Jameson Ranch, died and in September of that year Mr. and Mrs. Caldwell bought the ranch from her heirs. In this transaction, the Caldwells were represented by attorney Gerald Harland who had previously represented Jameson and Walker in their unsuccessful legal action for a right-of-way. The Jameson heirs first conveyed the ranch to Mr. Harland, who immediately conveyed it to the Caldwells.

Between July 1954 and the date of the above purchase in September 1955, Walker had conducted no logging operations on the property. Nevertheless, Mr. Harland, having known of the Jameson-Walker contract, attempted to determine its status before completing the purchase. Failing to locate Walker, he interviewed Roy and Earl Jameson who told him that Walker had abandoned the contract and that "it wasn't legal anyway." He found that the contract had not been recorded in Humboldt County. Within a few days of the purchase however, Walker learned that Mr. Harland had acquired the property and called at the latter's office. Mr. Harland, who was called as a witness for the plaintiffs, testified on cross-examination: ". . . he said he heard I purchased it and I told him that was correct, I purchased it for a logger and he said, well, what about his contract, and I related to him what Jameson said that they took the position that he had

no interest and whatever he did have he abandoned it and that he had no interest. And he said, well, he didn't feel that way, that he still claimed an interest in it. I said, 'Well, whatever difference you have would have to be worked out with the logger then.' '' The witness also testified that Walker called at his office sometime later in search of a copy of the contract at which time ''he did inform me that he still claimed an interest at that time.''

After his conversation with Mr. Harland and either in September or October 1955, Walker resumed logging operations on the Jameson Ranch for a few days during which time, according to his testimony, he removed 27,000 or 29,000 board feet. On December 21, 1955, he moved certain equipment onto the property and continued logging operations there during the early part of 1956. The trial court found that ''during and about the months of January, February and March, 1956,'' Walker cut and removed 317,000 board feet, net scale. During all of this time ''no trespassing'' signs in the name of Mr. Harland were posted on the property. On January 27, 1956, Caldwell served on Walker, through an employee of the latter, a written notice to the effect that he, Caldwell, had bought the property and that Walker was a trespasser.[1] Walker did nothing about the notice and continued his logging.

Accordingly, on February 14, 1956, the plaintiffs filed their original complaint against the Walkers seeking an injunction and treble damages as authorized by section 3346 of the Civil Code. The latter filed an answer and also a cross-complaint for damages for the logging and removal by the Caldwells of timber for which the Walkers had contracted. On May 12, 1959, the plaintiffs filed a supplemental complaint covering the period from February 14, 1956, the date of the original complaint, until April 10, 1956, seeking additional treble damages for acts committed during such period. The instant cause was thereafter consolidated for trial with a subsequent action for conversion instituted by these plaintiffs against various firms and individuals who purchased the timber from Walker.

The trial court found and concluded, so far as is pertinent to the issue raised before us, that Walker's entry upon the Jameson Ranch and his removal of the timber was ''without

---

[1]This notice, although received in evidence, has not been included in the present record.

any valid contractual right or other right or authority, and constituted an act of trespass . . .''; that such trespass was a "wilful and malicious trespass"; that the Jameson-Walker contract was void for want of court approval or confirmation, the plaintiffs not being estopped to assert its invalidity; that the plaintiffs were entitled to judgment against the Walkers for $9,510, which was triple the amount of actual damage in the sum of $3,170; and that the Walkers should take nothing by their cross-complaint. Judgment was entered accordingly.[2]

An award of treble damages for the cutting of, injury to or removal of timber is authorized by two code sections: section 733 of the Code of Civil Procedure and section 3346 of the Civil Code.[3] Although neither section expressly so provides, it is now settled that to warrant such an award of treble damages it must be established that the wrongful act was willful and malicious. (*Stewart* v. *Sefton* (1895) 108 Cal. 197, 206 [41 P. 293]; *Wolfsen* v. *Hathaway* (1948) 32 Cal.2d 632, 650 [198 P.2d 1]; *Butler* v. *Zeiss* (1923) 63 Cal.App. 73, 77 [218 P. 54]; *Mosesian & Sons* v. *Danielian* (1942) 52 Cal. App.2d 387 [126 P.2d 363]; *Swall* v. *Anderson* (1943) 60 Cal. App.2d 825, 828-829 [141 P.2d 912]; *Fick* v. *Nilson* (1950) 98 Cal.App.2d 683, 685 [220 P.2d 752]; *Roche* v. *Casissa* (1957) 154 Cal.App.2d 785, 788 [316 P.2d 776]; *Crofoot Lumber, Inc.* v. *Ford* (1961) 191 Cal.App.2d 238, 244-247 [12 Cal. Rptr. 639].) After reviewing all of the other foregoing cases, the court in the *Crofoot* case said: ''The above cases clearly lay down the rule, without conflict, that treble damages may only be awarded when the wrongdoer intentionally acted wilfully or maliciously. The intent required is the intent to vex, harass, or annoy or injure the plaintiff. It is a question of fact for the trial court whether or not such intent exists.''

[2]Judgment for conversion was also rendered against the various purchasers of the timber. Since none of the other defendants have appealed, we will not discuss them further.

[3]Section 733 of the Code of Civil Procedure in relevant part provides: ''Any person who cuts down or carries off any wood or underwood, tree, or timber . . . on the land of another person, . . . is liable to the owner of such land . . . for treble the amount of damages which may be assessed therefor, in a civil action, in any court having jurisdiction.''

Section 3346 of the Civil Code, as it read at the time of the trespass here involved, provided in relevant part as follows: "For wrongful injuries to timber, trees, or underwood upon the land of another, or removal thereof, the measure of damages is three times such a sum as would compensate for the actual detriment, except where the trespass was casual and involuntary, or committed under the belief that the land belonged to the trespasser, . . .''

(191 Cal.App.2d at p. 246.) ■ The foregoing two code sections are permissive and not mandatory and while they "prescribe the degree of penalty to be invoked they commit to the sound discretion of the trial court the facts and circumstances under which it shall be invoked." (*Swall* v. *Anderson, supra,* 60 Cal.App.2d at p. 830.) The parties before us agree that the above rules are here controlling but reach divergent conclusions upon their application.

■ Our particular inquiry, therefore, is directed to the factual ingredients essential to establish the willful and malicious act and to uncover the requisite intent which prompts it. In *Fick* v. *Nilson, supra,* 98 Cal.App.2d 683, evidence of the plaintiffs' ownership of the land involved was confusing while the uncontradicted evidence showed that the defendant attempted to protect his own property from damage "in a way he believed to be both rightful and not harmful." (P. 686.) This belief was supported by the fact that he had previously cut the trees with permission of a former owner, that he had attempted without success to find out if the plaintiff owned the land and finally that he had been advised by his own attorney that the plaintiff was not the owner. Striking down an award of treble damages and allowing only actual damages, the court concluded that "there is no evidence tending to indicate that he acted with any malice or with any intention to injure the respondent or anyone else." (98 Cal. App.2d at p. 686.) On the other hand, in *Roche* v. *Casissa, supra,* 154 Cal.App.2d 785, the defendant knew that the trees which he cut were not on his own land and, while he thought they were on the land of a church which would not object, "he made no real effort to determine actual title" and "disregarded the rights of the adjoining owner" (p. 789) by cutting the trees for the sole purpose of improving his own view. An award of treble damages was upheld. The acts involved in the above two cases appear in this sharp contrast: in *Fick,* the defendant did not act in disregard of anyone's rights; in *Roche,* he did. As we shall point out, such latter conduct is of the very heart of malice. The *Crofoot* case expresses these contrasting features in terms of good and bad faith as follows: "In *Fick, supra,* there was no evidence of bad faith, and in the *Roche* case it was apparent that the trial court could properly draw such an inference." (191 Cal.App.2d at p. 247.)

A proper and helpful analogue here is the award of ex-

emplary damages under section 3294 of the Civil Code when a defendant has been guilty, *inter alia,* of "malice, express or implied." Concerning the nature of malice authorizing such damages, this court, in *Gombos* v. *Ashe* (1958) 158 Cal.App.2d 517, 526-527 [322 P.2d 933], said: "In order to warrant the allowance of such damages the act complained of must not only be wilful, in the sense of intentional, but it must be accompanied by some aggravating circumstance, amounting to malice. Malice implies an act conceived in a spirit of mischief or with criminal indifference towards the obligations owed to others. There must be an intent to vex, annoy or injure. Mere spite or ill will is not sufficient." In 14 California Jurisprudence 2d, *Damages,* section 176, pages 810-811, the applicable principles are stated as follows: "An award of exemplary damages, in an action for damages for injuries inflicted by the defendant's malicious act, can be made only if the plaintiff can show that malice in fact, as distinguished from malice in law, existed with respect to the defendant's act. The distinction between malice in fact and malice in law is substantial. Malice in fact, or actual malice, denotes ill will on the part of the defendant, or his desire to do harm for the mere satisfaction of doing it. Malice in law, on the other hand, is merely a legal fiction; it is that form of malice which the law presumes, either conclusively or disputably, to exist on the production of certain designated evidence." Malice may consist of a state of mind determined to perform an act with reckless or wanton disregard of or indifference to the rights of others. (See generally 15 Am.Jur., Damages, § 280, p. 718 et seq.; see *Sturges* v. *Charles L. Harney, Inc.* (1958) 165 Cal.App.2d 306 [331 P.2d 1072].) Since a defendant rarely admits to such a state of mind, it must frequently be established from the circumstances surrounding his allegedly malicious acts.

 We proceed to apply the foregoing principles to the facts of the instant case. The first crucial development is the meeting between Walker and Mr. Harland in September 1955, some 14 months after Walker had stopped his operations on the Jameson Ranch. On this occasion, Mr. Harland told Walker that he had bought the ranch for a logger (not identifying Caldwell) and that, according to the Jamesons, Walker had no interest in the contract. We observe, moreover, that Mr. Harland testified "and I related to him *what Jameson said* that they took the position that he had no interest and whatever he did have he abandoned it and that he

had no interest.'' (Emphasis added.) The record shows, as we have already pointed out, that Mr. Harland, just prior to giving the above testimony, had testified as to his trip to the Jameson Ranch and his conversation (to which no objection was made) with Earl and Roy Jameson during which Earl had stated that Walker ''never did have any interest in the property'' and Roy had stated that Walker had abandoned his interest and ''it wasn't legal anyway.''

We think therefore that Mr. Harland's testimony in respect to his meeting with Walker can be reasonably construed to mean that he told the latter of the foregoing statements made to him by the Jamesons. This means that he told Walker not merely that, according to the Jamesons, Walker had no interest in the contract, but that he never had a valid contract in the first place, although it does not appear that the reason for the invalidity was ever pointed out. At the same meeting, Mr. Harland informed Walker that any difference would have to be worked out with ''the logger,'' meaning the new purchaser.

Despite this information, Walker, within a short time, resumed his logging operations at least for a few days. When he did so, he knew that the Jameson Ranch had a new owner and, while such owner's identity had not been disclosed, he was put on notice that the Jameson heirs, and presumably their vendee also, took the position that he had no valid contract.

Walker's claim before us that he ''was at all times acting under a belief, supported by the actions of the parties with whom he contracted and his attorney Gerald Harland, that he was acting under a valid contract'' has no merit. As we have pointed out, the Jamesons took the position that he never had an interest in the contract. Nor did Mr. Harland advise him that his contract was valid. Mr. Harland was not, and was not purporting to be, acting as Walker's attorney in September 1955. He was in fact Caldwell's attorney. While not naming Caldwell, he told Walker that he represented the purchaser. It is clear that he did not tell him the contract was valid. On the contrary, he informed Walker in effect that both the sellers and the buyers of the property regarded the contract as invalid.

The evidence shows that when Walker resumed logging operations on a more permanent basis in December, there were ''no trespassing'' signs posted on the property. He must have understood the significance of these, since they were under

Mr. Harland's name and Harland had already told him that, according to the Jamesons, Walker had no right to conduct logging operations on the property. Under the circumstances any reasonable man would conclude that the owner of the property and the owner's attorney regarded him as a trespasser. Any doubt on the matter was removed when, on January 27, 1956, Caldwell served on Walker the written notice to the effect that Walker was a trespasser and had no right to conduct logging operations on the ranch.

Walker knew that the Jamesons had sold their ranch to another person. He knew that the Jamesons had taken the position that he had no right to do logging on the property. From his conversation with Mr. Harland, he was put on notice that the purchaser would take the same position. Yet he made no inquiries of the Jamesons or anyone in respect to his logging contract. He made no attempt to obtain the advice of counsel. If he had, the absence of court approval of the contract would have undoubtedly been called to his attention. Paraphrasing the language of *Roche* v. *Casissa, supra,* Walker made no real effort to determine that the title of the new owner of the property was such that he, Walker, was not precluded from entering thereon and resuming his operations. Instead, he did enter upon the property and when notified to leave, refused to do so. We think that from the foregoing circumstances, the trial court could properly infer that Walker had acted in wanton and reckless disregard of and indifference to the rights of the plaintiffs. The trial court saw and heard the witnesses and was in a much better position than we are to evaluate the defendants' conduct, plumb the motives and state of mind behind it, and determine the good faith of the claim of right upon which the defendants sought to justify their actions. On this record, we cannot say that, as a matter of law and contrary to the court's finding, the defendants did not act wilfully and maliciously.[4]

Finally, the defendants claim that "no evidence of intent was shown" as to Mrs. Walker. We do not agree. Both husband and wife signed the contract with Roy Jameson. Both apparently were engaged in the logging business, as we have already pointed out. In their answer and cross-complaint

---

[4]In his memorandum decision, the learned trial judge stated that he was "of the opinion that defendants Walker were not acting *in good faith* even prior to the receipt of notice from plaintiff J. C. Caldwell under date of January 27, 1956." (Emphasis added.) It is notable that the same test of presence or absence of good faith was subsequently employed in the *Crofoot* case, *supra.*

filed herein the defendants alleged "that they entered upon said property under and by virtue of" the Walker-Jameson contract and that "in accordance with said contract, the cross-complainants commenced logging upon the said property in April of 1953, and continued said logging at various times thereafter." Mr. Windbigler, one of the defendants in the conversion action, testified that both Mr. and Mrs. Walker went to see him at the beginning of December 1955 in connection with logs on the Jameson Ranch. It is clear to us that the acts here complained of by the plaintiffs were part of a joint business enterprise of both Mr. and Mrs. Walker.

The judgment is affirmed.

Bray, P. J., and Molinari, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied March 13, 1963.