[Civ. No. 21723. First Dist., Div. One. July 29, 1965.]

DANIEL R. DREWRY, JR., Individually and as Trustee, etc., et al., Plaintiffs and Respondents, v. J. D. WELCH et al., Defendants and Appellants.

Timothy W. O'Brien, M. Mitchell Bourquin, John S. Howell and Donald Farbstein for Defendants and Appellants.

Harry W. Falk Jr., Huber & Goodwin and Dayton D. Murray, Jr., for Plaintiffs and Respondents.

BRAY, J.*—Defendants appeal from a judgment of the Superior Court of Mendocino County, sitting without a jury, in favor of plaintiffs in the sum of $298,654.91.

## QUESTIONS PRESENTED

1. Did title to all timber on plaintiffs' land pass to buyers?
2. Was a forfeiture declared?
3. Was the time for cutting timber extended by the Crofoot litigation?
4. Did defendants substantially comply with the 75 per cent clause?
5. Are plaintiffs estopped?
6. Is section 3346 of the Civil Code awarding double damages invalid?
7. Was the imposition of double damages mandatory?

## RECORD

This action arises out of a sale of timber evidenced by a contract between D. R. Drewry, Ethel L. Drewry, Daniel R. Drewry, Jr. and Barbara Drewry as sellers[1] and O. N. Lucas and E. J. Woodburn, Jr. as buyers dated May 3, 1950. Defendants have succeeded to the rights of said buyers in said contract. The complaint herein was brought to quiet title to plaintiffs' land upon which the timber is located, for an injunction and to recover damages for alleged trespass and conversion of timber after May 3, 1960. After trial the court

---

*Retired Presiding Justice of the District Court of Appeal sitting under assignment by the Chairman of the Judicial Council.

[1]D. R. Drewry and Ethel Drewry are deceased. Their interests in the land and timber were distributed to plaintiff, D. R. Drewry, Jr., as testamentary trustee. For convenience the sellers will be referred to as plaintiffs.

found that on May 3, 1950, the date of the contract, there was in excess of 23,600,000 feet, board measure, of merchantable timber on the Drewry ranch; that not more than 14,500,000 feet of said timber had been fallen before May 3, 1960; that defendants, other than Wayne Peters, up to May 3, 1960, falsely and mistakenly represented to plaintiffs that approximately 75 per cent of the timber had been fallen prior to that date; that the amount of timber removed after May 3 was 9,199,330 feet; that the removal of timber by defendants after May 3, 1960, constituted a trespass; that plaintiffs are entitled to compensatory damages for the timber removed subsequently to that date in the sum of $153,628.93 and that by virtue of section 3346 of the Civil Code those damages should be doubled to the amount of $307,257.84.

### EVIDENCE

The pertinent part of the contract is: "Buyers agree to buy all the merchantable fir timber on the real property hereinafter described for the price of Two ($2.00) Dollars per thousand board feet, . . .

". . . . . . . . . . .

"Buyers shall have a period of ten (10) years from date of this agreement within which to fall and remove the timber on the real property hereinafter described, and *in the event Buyers have fallen approximately seventy-five (75%) per cent of the timber by the termination of said ten (10) year period, they shall have an additional three year period within which to fall and remove* the balance of the timber herein agreed to be sold under this agreement." (Italics added.)

The land in question, the Drewry ranch, consists of about 3,231 acres in Mendocino County. The contract provided that logging was to begin within six months. However, as will hereinafter appear, the commencement of logging was prevented for approximately 18 months by the Crofoot litigation. Lucas and Woodburn, the original buyers, thereafter felled some trees prior to March 28, 1954, but did not remove any logs. Thereafter several assignments of the contract were made by the buyers and their successors and timber removed by the assignees. On May 3, 1960 (the expiration of the 10-year period provided in the contract), the contract was owned by defendants Welch and Mendo. Defendant Peters then had a logging contract with them. Peters under his contract continued to fall and remove timber until early 1961. By May 3, 1960, out of the 23,600,000 plus feet of timber, board measure, on the land at the time of entry into the

contract, not more than 14,500,000 feet had been fallen. There was evidence that defendants represented to plaintiffs in late 1959 and up to May 3, 1960, that they had fallen over 75 per cent of the timber. Plaintiffs found out in late 1960 that the amount of timber fallen was only 61.44 per cent and notified defendants to cease cutting timber. Defendants continued to cut and remove timber until this action was filed.

### 1. *Did title pass to all timber?*

Defendants contend that through the contract of sale title to all the timber on plaintiffs' land passed to the buyers and that the time provision is merely a covenant, the violation of which does not terminate the buyers' right to the timber. To this effect they cite *Peterson* v. *Gibbs* (1905) 147 Cal. 1, 6 [81 P. 121, 109 Am.St.Rep. 107] ; *Gibbs* v. *Peterson* (1912) 163 Cal. 758, 766 [127 P. 62] ; *Anderson* v. *Palladine* (1918) 39 Cal.App. 256, 261 [178 P. 553] ; *Ciapusci* v. *Clark* (1909) 12 Cal.App. 44 [106 P. 436]. These cases were distinguished if not overruled in *Mallett* v. *Doherty* (1919) 180 Cal. 225, 228-229 [180 P. 531, 15 A.L.R. 19], and referred to in *Whittaker* v. *Thompson* (1959) 53 Cal.2d 192, 194 [347 P.2d 7], where the court said: ''The rule is established in California that where there is a contract for the sale of standing trees to be removed within a specified time, title passes to the vendee to only those trees which he cuts and removes within the designated period. Title to the remaining trees is in the vendor.

''The rule is thus stated in *Mallett* v. *Doherty,* 180 Cal. 225, 229 [180 P. 531, 15 A.L.R. 19] : 'The rule of construction as to contracts for the sale of standing trees to be removed within a specified time is thus stated in 28 Am. & Eng. Ency. of Law, p. 541: ''Contracts for the sale of standing trees to be removed within a specified time have generally been construed by the courts as sales of only so many trees as the vendee might cut and remove within the time designated, the balance remaining the property of the vendor.'' (See, also, 25 Cyc. 1549; 17 R.C.L. 1084, and 55 L.R.A. 526.)' '' (See also *Call* v. *Jenner Lumber Co.* (1917) 33 Cal.App. 310, 315 [165 P. 23].)

The provisions of the instant contract clearly set forth that the buyers' right to an additional three years to fall and remove timber arises only *if* the buyers, within the 10-year period, have fallen approximately 75 per cent of the timber.

In *McCreary* v. *Mercury Lumber Distributors* (1954) 124 Cal.App.2d 477 [268 P.2d 762], the court, in distinguishing its case from *Anderson* v. *Palladine, supra* (cited by defendants as hereinbefore set forth), pointed out that in the contract it was reviewing ''there was no absolute conveyance of the timber to appellant, but [was] merely a sale of the timber as and when removed by appellant, as is indicated in the payment provision.'' (P. 485.) The terms of payment were similar to those in the case at bench, so much per thousand board feet.

In view of the intention of the parties as expressed in the contract, the provisions of section 658, subdivision 4 of the Civil Code (stating ''industrial growing crops and things attached to or forming part of the land, which are agreed to be severed before sale or under the contract of sale, shall be treated as goods and be governed by the provisions of the title of this code regulating the sales of goods'') and section 660 of the Civil Code (containing similar language), do not require a determination that the title to all the timber passed before removal from the land. ▆ The fact that growing timber may be treated as goods in a sales contract does not cause the title to pass ipso facto unless the contract shows that to be the intention of the parties. Section 1739 of the Civil Code, in effect at the time of the trial, sets forth rules for determining the time as to which the property or the goods is to pass to the buyer unless a different intention appears.

*Palmer* v. *Wahler* (1955) 133 Cal.App.2d 705 [285 P.2d 8], cited by defendants, states, after referring to sections 658 and 660 of the Civil Code, ''Further, it would seem only logical that aside from the provisions of these code sections, a sale of timber for the purpose of cutting and removing it from the land would amount to a constructive severance until such time at least as there should be, if ever, a reuniting or merger of the ownership of the land and the timber again into common ownership.'' (P. 712.) This case relied for its authority on *Peterson* v. *Gibbs, supra,* which, as we have shown, was distinguished in *Mallett* v. *Doherty, supra,* and is contrary to the weight of authority in California.

*Dunham* v. *Taylor* (1957) 211 Ore. 618 [317 P.2d 926] holds ''A contract for the sale of timber on a given tract of land with a proviso that it shall be removed prior to a time specified while vesting a present title in the grantee or vendee, is an estate upon condition liable to be defeated with-

in the time specified. . . . The law is well settled that the interest of a purchaser under a timber contract of sale stipulating for removal within a specified period, terminates at the expiration date of the sales contract even though the purchaser, as here, has paid the consideration required by the contract.'' (P. 929 [317 P.2d].)

In the instant contract appears the language ''Buyers and Sellers specifically agree that title to the timber agreed to be sold under the terms of this contract shall not pass to Buyers until said timber, logs and lumber is [*sic*] paid for. This is intended as a protection for the benefit of Sellers, . . .''

2. *Not a forfeiture.*

Defendants contend that in determining that their rights to the timber terminated when they failed to fall 75 per cent of it before May 3, 1960, the court was declaring a forfeiture and cite cases dealing with forfeitures. ■ These cases are not in point as this is not a case of forfeiture but of a failure by defendants to properly exercise an option which would grant them the right to continue logging on plaintiffs' land. Their failure to do so brought an end to their rights to the timber and made their entry on plaintiffs' land a trespass. ■ Defendants contend that the 75 per cent clause was merely a covenant to insure complete removal of the timber within a 13-year period, and not a condition requiring termination of the buyers' right on the grounds of nonperformance. This contention is incorrect. The trial court properly held that defendants' rights under the contract expired with the passage of time and with failure to comply with the option which would have extended the time of operation. See *Crofoot Lumber, Inc.* v. *Thompson* (1958) 163 Cal.App.2d 324, 335 [329 P.2d 30], where the contention was made that the trial court's action in holding that the seller could terminate the contract for the sale of timber for failure to remove the timber within a reasonable period constituted a forfeiture. The court held that it did not. The buyers' ''conduct gave to . . . [the seller] the option to consider itself released from all obligations to him and to terminate the contract between them, by the faithful performance of which alone . . . [the buyer] could maintain and capitalize his right to take . . . [the seller's] timber.'' (P. 335.)

3. *No extension of time.*

Prior to entering into the subject contract plaintiffs negotiated with one Field for the sale of their timber to him.

Field did not make any advance payment and died about a month later. In the spring of 1948 Mrs. Field brought Henry Crofoot to plaintiffs and they negotiated for sale of the timber to Crofoot. Plaintiffs wanted a down payment of $5,000. Crofoot paid $1,000 and was to pay the balance when the contract was signed. In the fall of 1948 Crofoot paid an additional $2,000. No contract was executed because Crofoot had not paid the entire $5,000. Crofoot did nothing from 1948 until 1950 so plaintiffs negotiated with Lucas and Woodburn and on May 3, 1950, entered into the subject contract with them. Their operation was halted by Crofoot's threat of litigation and then by the action he brought in January 1951 against plaintiffs joining Lucas and Woodburn as defendants. This litigation ended June 26, 1952, with a judgment for Crofoot against Drewry, Lucas and Woodburn in the sum of $2,500.[2] Defendants contend that the time for performance of the instant contract was extended by the Crofoot situation for a period of at least 18 months. The court found that Lucas and Woodburn had been advised of Crofoot's claim prior to May 3, 1950, and entered into the contract "with full knowledge of the possibility of the assertion of rights or litigation by Crofoot" (Drewry, Jr. testified that Lucas and Woodburn "were fully aware of all negotiations we had had with Mr. Crofoot"); that Lucas and Woodburn, as defendants, participated in the Crofoot litigation; and that on June 4, 1952, an addendum to the contract modifying it was executed by the Drewrys and Lucas and Woodburn and no provision was placed therein which in any way modified the term for the removal of the timber. The court, in effect, held that the Crofoot litigation did not extend the time of performance of the contract.

The circumstances in the case at bench were entirely different from those in *Hill* v. *State Box Co.* (1952) 114 Cal. App.2d 44 [249 P.2d 903], cited by defendants, in which the court held that the failure of the buyer to remove timber from the seller's land within four years was due to the seller's failure to establish title to the timber within that time and that the clearing of title by the seller was a condition precedent under the contract to the buyer's obligation to commence performance.

In our case the evidence discloses that Lucas and Wood-

---

[2]This judgment was paid with money furnished plaintiffs by Lucas and Woodburn and credited against the price of timber to be removed.

burn failed to do any logging from the time the Crofoot suit terminated in June 1952 until they sold out to Cox March 28, 1954. Nor did all the various assignees of the contract work diligently to remove 75 per cent of the timber within the 10-year period. Thus, during the ownership of the contract by the Lakeside Lumber Company, while they felled some trees, most of their activity was in removing trees theretofore fallen. There was a period from July 1959 to March 1960 when no timber was fallen. Apparently during the 10-year period none of the assignees complained about the delay caused by the Crofoot litigation. On June 4, 1952, an amendment to the original contract was executed by the parties. ■ While this amendment dealt only with the monetary effect of the Crofoot litigation, the very fact that at that time the buyers did not seem interested in suggesting an extension of their time to perform raises an inference that the parties did not intend any extension as a result of the Crofoot litigation. ■ Section 1511, subdivision 1, of the Civil Code, providing that any delay in the performance of an obligation "is excused" when performance is delayed "by the act of the creditor . . . even though there may have been a stipulation that this shall not be an excuse" and cases like *Peter Kiewit Sons' Co.* v. *Pasadena City Junior College Dist.* (1963) 59 Cal.2d 241 [28 Cal.Rptr. 714, 379 P.2d 18], are not applicable here because the evidence discloses that the failure of defendants to fall the required amount of timber in the 10 years was not due to the Crofoot litigation but to the dilatoriness of Lucas and Woodburn and the subsequent assignees. The 18 months of the Crofoot litigation did not extend the May 3, 1960, deadline.

4. *No substantial compliance.*

■ The contract required that to obtain the three-year extension, approximately 75 per cent of the timber had to be fallen. The court found that only approximately 64 per cent was felled prior to May 3, 1960. This is not approximately 75 per cent. ■ The evidence was in conflict on this subject, defendants contending that the correct figure was 72½ per cent. Under the well-known rule, where there is a conflict of evidence, we are bound by the trial court's findings on the subject. ■ Apparently most of the difference between the figures of the parties is based upon the Cox old fall, claimed by defendants to be 1,130,000 feet, and the Peters fresh fall claimed to be 1,000,000 feet. As the court pointed

out in its opinion, no attempt was made to scale the logs felled by Cox; a number of loggers had removed some of these logs and left the others indicating that they did not regard them as merchantable (the contract required that the timber, the object of the contract, be merchantable); the witness Buhlman testified that the Cox logs left on the ranch were not merchantable, that logs such as those left on the ground deteriorate rapidly; Cox himself testified that fallen logs should be removed within one year. ██ The burden, of course, was on defendants to prove that they had fallen the required amount of timber. ██ The court found that they did not do this and that the figure of one million feet of Cox merchantable timber was too speculative and conjectural to accept. As to the Peters fall before the deadline no records were preserved and the court felt that Peters' estimate was only speculative.

The court's finding on the amount of timber fallen is supported by the evidence.

### 5. *Estoppel.*

██ Defendants seek to invoke a doctrine of estoppel claiming that plaintiffs acquiesced in the removal of timber from their property after May 3, 1960, and up to October 1960 because plaintiffs failed to raise the issue of the 75 per cent clause during this period and accepted payment for some of the timber thus removed. The contention is meritless as the trial court found: ''That in the fall of the year 1959 after logging had been completed on the Drewry Ranch for that year and thereafter up to May 3, 1960, the Defendants herein, other than the Defendant Wayne Peters, fraudulently represented to the Plaintiffs that there remained only 1,400,000 feet, board measure, of merchantable timber upon the Drewry Ranch at that time. That in reliance upon such fraudulent representation as to the volume of timber remaining upon the Drewry Ranch, the Plaintiffs were led to believe that approximately 75% of the timber had been removed and that the Plaintiffs had no right to object to further logging on the Drewry Ranch after May 3, 1960.''[3] The evidence reveals that plaintiffs were led to believe that only 1,400,000 feet of timber was left on the land, therefore they believed the 75 per cent clause had been complied with.

---

[3]The court made another finding in almost the identical language of this one substituting ''mistakenly represented'' for ''fraudulently represented.''

### 6. *Double damages.*

Section 3346 of the Civil Code provides in pertinent part: "(a) For wrongful injuries to timber, trees, or underwood upon the land of another, or removal thereof, the measure of damages is three times such sum as would compensate for the actual detriment, except that where the trespass was casual or involuntary, or that the defendant in any action brought under this section had probable cause to believe that the land on which the trespass was committed was his own or the land of the person in whose service or by whose direction the act was done, the measure of damages shall be twice the sum as would compensate for the actual detriment, . . ." The question of the validity of the portion of said section which provides for double damages has never been raised or determined before and is a matter of first impression. The present statute was adopted in 1957 repealing the old section. (Stats. 1957, ch. 2346, p. 4076.) Prior to that time section 3346 read, so far as pertinent here, the same as the new, except that for the injuries mentioned the damages now provided to be twice the amount of the actual damages were there provided to be only "a sum equal to the actual detriment."

The matter of awarding *treble* damages under section 3346 of the Civil Code and section 733 of the Code of Civil Procedure which latter provides for treble damages for cutting or carrying away trees, timber, etc., has been passed upon a number of times. In each case, without discussion as to whether the sections would be invalid without such interpretation, they were interpreted to require that the act for which treble damages were sought must have been done wilfully and maliciously, although no such requirement appeared in the sections nor now appears in them. As said in *Caldwell* v. *Walker* (1963) 211 Cal.App.2d 758, 762-763 [27 Cal.Rptr. 675] : "An award of treble damages for the cutting of, injury to or removal of timber is authorized by two code sections: section 733 of the Code of Civil Procedure and section 3346 of the Civil Code. [Fn. omitted.] Although neither section expressly so provides, it is now settled that to warrant such an award of treble damages it must be established that the wrongful act was willful and malicious. [Here follow seven citations of Supreme Court and District Court of Appeal cases.] (*Crofoot Lumber, Inc.* v. *Ford* (1961) 191 Cal.App.2d 238, 244-247 [12 Cal.Rptr. 639].) After reviewing all of the other foregoing cases, the court in the *Crofoot*

case said : 'The above cases clearly lay down the rule, without conflict, that treble damages may only be awarded when the wrongdoer intentionally acted wilfully or maliciously. The intent required is the intent to vex, harass, or annoy or injure the plaintiff. It is a question of fact for the trial court whether or not such intent exists.' (191 Cal.App.2d at p. 246.) The foregoing two code sections are permissive and not mandatory and while they 'prescribe the degree of penalty to be invoked they commit to the sound discretion of the trial court the facts and circumstances under which it shall be invoked.' (*Swall* v. *Anderson, supra,* 60 Cal.App.2d at p. 830 [141 P.2d 912].)''

In the case at bench the court found ''That it is not true that the Defendants were acting with the desire to vex or annoy or harass the Plaintiffs in removing the timber from the Plaintiffs' property after May 3, 1960; that it is true that Defendants mistakenly believed that they had a right to continue their logging operations after May 3, 1960.'' Thus we have a definite finding that the acts of defendants complained of were not wilful or malicious.

In determining whether the *double* damages portion of section 3346, which does not require proof of wilful or malicious intent to be applied is valid, we must assume that the provision is penal rather than remedial as it has been so held in several cases.[4]

''We have concluded that the new section is not entirely procedural, nor is it remedial, but that it creates new obligations and exacts new penalties because of past transactions, and hence those provisions relating to double damages must be treated as penal and punitive. They are clearly so classified by the Civil Code itself (div. 4, pt. 1, ch. 2, art. 3) and so treated in *Swall* v. *Anderson,* 60 Cal.App.2d 825, 828 [141 P.2d 912]; and *Fick* v. *Nilson,* 98 Cal.App.2d 683 [220 P.2d 752].'' (*Helm* v. *Bollman* (1959) 176 Cal. App.2d 838, 841 [1 Cal.Rptr. 723].)

''The statute is essentially one imposing penalties. [Fn. omitted.] (*Swall* v. *Anderson,* 60 Cal.App.2d 825 [141 P.2d 912]; *Crofoot Lumber, Inc.* v. *Ford,* 191 Cal.App.2d 238 [12 Cal.Rptr. 639]; *Helm* v. *Bollman,* 176 Cal.App.2d 838 [1 Cal.Rptr. 723]; *United States* v. *Magnolia Motor & Logging Co.,* 208 F.Supp. 63.) This makes for strict construction. (*Savings & Loan Society* v. *McKoon,* 120 Cal. 177, 179 [52

---

[4]It is well established that the *treble* damages portion also is penal. (See *Caldwell* v. *Walker, supra,* 211 Cal.App.2d 758, 762.)

P. 305].)'' (*Ghera* v. *Sugar Pine Lumber Co.* (1964) 224 Cal.App.2d 88, 92 [36 Cal.Rptr. 305].)

 ''Section 3346 of the Civil Code as reenacted arbitrarily provides for double damages in instances where prior thereto damages were a sum equal to the actual detriment. To that extent it is penal, not procedural.'' (*Helm* v. *Bollman, supra,* 176 Cal.App.2d 838, 843.)

 But the fact that the statute is penal does not mean that the Legislature does not have the power to make the cutting of timber without right and without fault subject to multiple damages nor to make the statute invalid. In *Jeansonne* v. *Marath* (La.App. 1952) 61 So.2d 598, in an action under the Housing and Rent Act by a tenant to recover treble the amount of claimed rent overcharge, the court referred to statutes providing multiple damages as giving the aggrieved party ''punitive liquidated damages.'' (P. 600.)

We have not been cited to and have found no authority holding that the Legislature does not have the power to prescribe punitive liquidated damages in torts where the tort occurred without wilfulness or malice. There are several situations in California to which penal statutes apply. In *Kennedy* v. *Minarets & Western Ry. Co.* (1928) 90 Cal.App. 563, 581 [266 P. 353], considering the application of former section 3346, subdivision (a) of the Civil Code providing liability for treble damages to anyone negligently setting fire to his own woods or suffering it to extend beyond his own land, the court said '' 'It is within the power of the legislature to impose on railroad companies an absolute liability for fire started by locomotives.' (*St. Louis Ry. Co.* v. *Shore,* 89 Ark. 418 [117 S.W. 515, 16 Ann.Cas. 939, and note]; *Union Pacific Ry. Co.* v. *De Busk,* 12 Colo. 294, 13 Am.St.Rep. 221, and note [3 L.R.A. 350, 20 P. 752].) 'And it has been held that the power extends to the imposition on such companies of liability for treble damages irrespective of negligence. *Jensen* v. *South Dakota Ry. Co.,* 25 S.D. 509 [127 N.W. 650, Ann. Cas. 1912C 700, 35 L.R.A. N.S. 1015].' '' (Pp. 580-581.) (See *County of Ventura* v. *Southern Cal. Edison Co.* (1948) 85 Cal.App.2d 529, 534 [193 P.2d 512].)

Section 3015 of Corporations Code provides for a penalty to be payable to a requesting shareholder for failure of the corporation within 30 days to keep the required share register or books of account or to submit required financial statements.

. Section 52 of the Civil Code provides that for violation of the rights guaranteed by section 51, the one denied such rights may recover $250 in addition to actual damages.

In *Greenberg* v. *Western Turf Assn.* (1903) 140 Cal. 357 [73 P. 1050], the plaintiff brought an action for damages and for the $100 penalty provided by Statutes 1893, page 220, for refusing him admission to the defendant's race track. The court held "The imposition is in its nature penal," (p. 364) and that the plaintiff could recover his actual damages, exemplary damages, and in addition the $100 penalty.

Section 2209 of the Civil Code provides that for the refusal to carry, or for postponement of, a message, recovery may be had of actual damages and $50.

Section 2941 of the Civil Code provides that for refusal to execute a certificate of discharge of a mortgage or deed of trust, the mortgagee is liable to the mortgagor for all damages plus the sum of $300.

Former section 3024 of the Civil Code provides that for failure to mail a statement of satisfaction of an obligation secured by assignment of accounts receivable a recovery may be had for all actual damages and a penalty of $100.

Former section 3040 of the Civil Code provided that for failure to deliver certificate of satisfaction of indebtedness secured by lien, actual damages plus a penalty of $100 may be recovered.

Former section 3344 and section 3345 of the Civil Code provided treble rents for holding over.

Former section 3081.9 of the Civil Code provided that for usury, the borrower could recover three times the amount paid, plus attorney's fees.

Section 2573 of the Public Utilities Code provides that for violation of the Food Warehousemen Act recovery could be had of an amount equal to three times the amount of actual damages.

Section 1812.9 of the Civil Code provides for recovery of three times the total price differentials or service charges for violation of the Retail Installment Sales Act (the Unruh Act).

Section 7951 of the Public Utilities Code provides for recovery of three times actual damages for injury to telegraph, telephone, electric power or gas property.

In *Harold* v. *Toomey* (1916) 92 Wash. 297 [158 P. 986], an action for trespass under a statute providing for the trebling of damages for cutting down or injuring trees without

lawful authority, the court said "the statute was enacted for a just, double purpose, to punish a voluntary offender and to provide, by trebling the actual present damage, a rough measure of compensation for future damages not generally ascertainable. Although the statute is penal in its nature, this action is not a criminal or penal action, but is merely a civil action for tortious damages, with added penal damages. It is not, therefore, necessary to prove an intent on the part of the tort-feasor, any more than the commission of the act and its consequences.'' (P. 987.)

The validity of a statute similar to section 3346 was established in *State* v. *Shevlin-Carpenter Co.* (1906) 99 Minn. 158 [108 N.W. 935]. That statute provided in pertinent part that for cutting timber on the state's land without a permit, the trespasser would be liable to the state in treble damages "if such trespass is adjudged to have been willful; but double damages only in case the trespass is adjudged to have been casual and involuntary, . . .'' (P. 935 [108 N.W.].) The statute also made such cutting of timber a felony. The defendant contended that the double damages portion of the statute was obnoxious to constitutional principles. In holding that it was not, the court said "The gist of the objection to the statute is that it punishes a person for an act which might, under some circumstances, be the result of a simple mistake, an act innocent in itself and committed with no evil purpose or intent. This, however seemingly meritorious at first thought, is without force. . . .

"The act under consideration, in so far as it imposes a criminal punishment or double damages for the casual or involuntary trespass, dispenses with the necessity of proving a malicious or other wrongful purpose and the pivotal question is whether the Legislature could, within constitutional restrictions, so enact. The law on this subject is correctly summed up in Clark & Marshall's Law of Crimes, as follows: 'Public policy may require the Legislature, in prohibiting and punishing particular acts under certain circumstances, to provide expressly or impliedly, that any person who shall do the act shall do it at his peril, and that he shall not be allowed to escape punishment by showing that he acted in good faith, without negligence, and in ignorance of the existence of the circumstances rendering the act unlawful. If the language and subject-matter of the statute show clearly that this was the intention of the Legislature, the

courts must give it effect, however harshly the statute may seem to operate in the particular instance.' The principle of law thus laid down is supported by an almost unanimous line of authorities both in this country and in England.'' (108 N.W. at p. 937.) Although this case dealt with state lands no reason appears why the Legislature may not protect private timber lands in the same manner. (Cf. *United States* v. *Magnolia Motor & Logging Co.* (1962) 208 F.Supp. 63.)

In *United States* v. *Hult* (1963) 319 F.2d 47, the United States Court of Appeals, 9th Circuit, in reversing a decision of the Oregon United States District Court directed that judgment be entered in favor of the government pursuant to Oregon statute 105.815 (the same statute referred to in *Kinzua Lumber Co.* v. *Daggett, infra*), the language of which is identical to the double damages portion of section 3346, for double the amount of the actual damages suffered by reason of cutting timber without permission on the government land.

Ordinarily, for exemplary damages in a tort action, the plaintiff must look to section 3294 of the Civil Code which provides ''In an action for the breach of an obligation not arising from contract, where the defendant has been guilty of oppression, fraud, or malice, express or implied, the plaintiff, in addition to the actual damages, may recover damages for the sake of example and by way of punishing the defendant.'' However, as we have hereinbefore shown, the Legislature has seen fit to provide for fixed punitive damages to be recoverable by an injured party in special situations.[5] One of these is that provided for in section 3346.

Particularly applicable to the cutting and removing of timber without the owner's permission is the following statement from 70 Harvard Law Review 522: ''The need for deterrence is particularly obvious in those torts, such as conversion, which involve wrongful gains to the defendant, since compensatory damages will at most restore the wrongdoer to the *status quo ante* and may even leave him with a profit.''

In 44 Harvard Law Review 1190-1191 the writer objects to punitive damages being imposed only where the trespasser's acts have been wilful, malicious and the like. He states that

[5]70 Harvard Law Review 518 states that the statutory device of double or treble damages is used in nearly every state. ''This technique is of respectable antiquity; in the common law it dates back to 1278.'' For a considerably older use of multiple damages see Exodus 22:9, note 13, 70 Harvard Law Review 518.

these tests (wilfulness, etc.), "prevent the use of the doctrine in cases where it is needed, for these tests have a connotation that the defendant must be found to be 'morally bad' before he can be admonished more severely than by being required to compensate the plaintiff; they may exclude the operation of the doctrine from cases in which severe admonition of 'good' people is needed. A more desirable indication of the scope of the use of punitive damages should be framed in terms of the needs and efficacy of admonition, so that the doctrine could be used in the education of blunderers as well as for the discouragement of rogues." Section 3346 of the Civil Code providing in effect treble damages against the rogue and double damages against the blunderer is so framed to meet a special situation existing in the timber lands.

This situation and the need for protection is well described in the Oregon case of *Kinzua Lumber Co.* v. *Daggett* (1955) 203 Ore. 585 [281 P.2d 221]. Oregon has a statute almost identical with section 3346, providing treble damages for wrongful cutting of trees but only double damages if the trespass "was casual or involuntary, or that the defendant had probable cause to believe that the land on which the trespass was committed was his own. . . ." It was stipulated that " 'the trespass was inadvertent, but wrongful and without authority.' " (P. 222 [281 P.2d].) In upholding a judgment for double damages and deciding that the statute was valid without requiring a showing that the trespass was other than inadvertent,[6] the court pointed out the reason for the legislation providing for such punitive damages. "It may be that when the Legislature adopted ORS 105.815 it believed that when an owner of land, from which another wrongfully cut trees, recovered judgment for the value of the trees, or for the difference in the value of the land immediately before and immediately after the taking, he was not made whole. If it so believed it could have given good reasons in support of its belief, as we will now show.

"Although the general purpose of the law is to award just compensation to the victim of a wrong, it is well known that full compensation is not always made. The law of damages does not subject the wrongdoer to liability for all of the harmful consequences of his act, but only for the proximate

---

[6]The court said that the statute "plainly indicates a legislative design for its application in cases wherein the offender had no evil purpose." (P. 223 [281 P.2d].) Section 3346 likewise indicates a similar legislative design.

results. The proximate result rule yields much less for the victim than if he were given the benefit of a harmful consequences rule. Further, the very fact that the victim must institute an action for the recovery of damages subjects him to inconveniences, annoyances, preparation for trial, loss of time and the payment of an attorney fee, for all of which he will receive no compensation except an allowance of the nominal sum which represents costs. Let us now proceed directly to the matter of trees. Trees have long lives and, generally, more than a half century of growth must take place before they approach maturity. If they are felled when they are mature and when a mill or good transportation is nearby, the return will be much greater than if they are felled when those favorable conditions are absent. During the life of a tree, several cycles of good prices and low prices may succeed one another. The value of a tree is largely dependent upon the current economic cycle. If a wrongdoer, in a period of adverse market prices, destroyed immature trees in a remote area far removed from an access road, the owner might face a difficult problem of proving his damages, and in the end might receive a judgment in an amount far less than his loss. A wrongful act committed under such circumstances might deprive the owner of an asset which, years hence, under favorable conditions, would have made him a wealthy man. The problem of ascertaining the value of a tree is more difficult than that of finding the value of other articles which have shorter lives and which are not rooted to the soil.'' (281 P.2d at pp. 225-226.)

In *Crofoot Lumber, Inc.* v. *Ford* (1961) 191 Cal.App.2d 238 [12 Cal.Rptr. 639], an action for damages for wrongful removal of timber, the court refused to apply the double damages provision of section 3346 for the reason that the trespass occurred prior to 1957 and the provision was not adopted until 1957. However, the court indicated the necessity for a multiple damages requirement for the cutting of growing timber by saying: ''McCormick in his Handbook on the Law of Damages (1935 ed.) makes this comment at page 492: 'If the wrong complained of is . . . the cutting of them [plaintiff's trees] by the defendant and his appropriation of the timber, then, if the defendant's depredation was done under an innocent mistake as to boundary or ownership, he will usually be held in an action in the nature of trespass to the land, as in the cases . . . . of negligent injury to the timber by fire or the like, only for the diminished value of the

land or the value of the trees before cutting. This hardly seems an adequate measure of relief to a plaintiff who intended to market his trees, not by selling them as standing timber, but by cutting them and selling them as logs or lumber.' McCormick cites with approval *Green* v. *Southern Timber Co.*, 291 F. 582, 584, where it was said: 'Reckoning the damage on the basis of stumpage would be to disregard the unwillingness of the owner to sell. The defendant was a trespasser, even though unwittingly. Surely he should be content to forego any profit. . . .' " (191 Cal.App.2d at pp. 248-249.)

In *Lindroth* v. *Windbigler* (1965) 232 Cal.App.2d 844 [43 Cal.Rptr. 355], an award of double damages under section 3346 was upheld where the trial court found "that the trespass was casual and involuntary" and not " 'wilful and malicious.' " (P. 845.) The question of the validity of the section was not raised. The court, in a footnote, citing *Caldwell* v. *Walker, supra,* 211 Cal.App.2d 758, 762, to the effect that to award *treble* damages required that the trespass be wilful and malicious, seemed to indicate that there is no such requirement for awarding *double* damages.

### 7. *Double damages are mandatory.*

The record indicates that the trial court was of the opinion that section 3346 of the Civil Code was mandatory and that it could not exercise its discretion in imposing or withholding multiple damages.[7] Prior to the amendment of section 3346 in 1957, *supra,* that section provided that for the wrongful injury described "the *measure of damages is* three times" (italics added) the actual damages, but if "the trespass was casual and involuntary" etc. the "damages are a sum equal to the actual detriment." Thus, the section provided for two measures of damages: double under certain circumstances and actual if under other circumstances. By the amendment the section now provides for three measures of damages: treble as before amendment; double for casual and involuntary trespass, etc. and "actual detriment" where the wood is taken under certain authority.

---

[7]In its opinion and order for findings, the trial court said "The Court is of the opinion that Section 3346 does not allow the Court any discretion in fixing punitive damages, since that section states that under the circumstances which the Court has found to exist here the measure of damages 'shall be twice the sum as would compensate for the actual detriment.' The term 'shall' has frequently been interpreted to be mandatory and a doubling of the damage is, therefore, mandatory."

The courts have construed the treble damages portion of the section prior to amendment as discretionary and not mandatory. (*Swall* v. *Anderson* (1943) 60 Cal.App.2d 825, 828-829 [141 P.2d 912]; *Roche* v. *Casissa* (1957) 154 Cal. App.2d 785, 788 [316 P.2d 776]; *Crofoot Lumber, Inc.* v. *Ford, supra,* 191 Cal.App.2d 238, 247.) In arriving at that determination the court in *Swall* v. *Anderson, supra,* pointed out the similarity between sections 733 of the Code of Civil Procedure and 3346 of the Civil Code and said ''As sections 733 of the Code of Civil Procedure and 3346 of the Civil Code relate to the same subject matter they must be construed together.'' (P. 829.)

Section 733 of the Code of Civil Procedure then read and now reads: ''Any person who cuts down or carries off any wood or underwood, tree, or timber, or girdles or otherwise injures any tree or timber on the land of another person, or on the street or highway in front of any person's house, village, or city lot, or cultivated grounds; or on the commons or public grounds of any city or town, or on the street or highway in front thereof, without lawful authority, is liable to the owner of such land, or to such city or town, for treble the amount of damages which may be assessed therefor, in a civil action, in any court having jurisdiction.''

It will be noted that this section provides for only one measure of damage for practically the same acts to which section 3346 provides three measures of damages. However, in effect, it applies only to situations in which the cutting of timber was done wilfully and maliciously because the above mentioned cases and others held that treble damages could only be imposed under either section if the trespass was wilful and malicious.

As pointed out in *Swall* v. *Anderson, supra,* at page 829, the language in section 3346 was ''the measure of damages is'' and in section 733 was ''is liable.'' In the amendment to section 3346 in 1957 no change was made in this language as to the treble damages portion. It still reads ''the measure of damages is.'' The language of section 733 was not changed. However, when section 3346 was amended to provide for double damages instead of actual damages for a trespass that was ''casual or involuntary'' etc. the Legislature used the mandatory word ''shall'' saying ''the measure of damages *shall* be twice. . . .'' (Italics added.)

We must assume that the Legislature knew that the courts had interpreted the treble damages provisions in the

two sections as being discretionary and therefore in making no change in the language of those provisions it did not intend to make those provisions other than discretionary except as affected by the double damages provision.[8] ▮ The fact that as to that provision the Legislature did not use the discretionary language "the measure of damages *is*" (italics added) but said "the measure of damages *shall* be" (italics added) indicates clearly that it meant such provision to be mandatory. ▮ So, the effect of section 3346 as amended, read together with section 733, is that the Legislature intended, insofar as wilful and malicious trespass is concerned under either section, to leave the imposition of treble damages discretionary with the court, but to place a floor upon that discretion at double damages which must be applied whether the trespass be wilful and malicious or casual and involuntary, etc.[9] ▮ There are now three measures of damages applicable to the pertinent types of trespass: (1) for wilful and malicious trespass the court *may* impose treble damages but *must* impose double damages; (2) for casual and involuntary trespass, etc., the court *must* impose double damages; and (3) for trespass under authority actual damages.

▮ The trial court correctly ruled, once liability was established, that the imposition of double damages was mandatory.

The judgment is affirmed.

Sullivan, P. J., and Sims, J., concurred.

A petition for a rehearing was denied August 23, 1965, and appellants' petition for a hearing by the Supreme Court was denied October 7, 1965.

---

[8] "It will be assumed that the legislature, in enacting a statute, knew . . . existing judicial decisions construing the same or related statutes, and that it enacted new statutes and amendments in the light thereof." (45 Cal.Jur.2d, § 101, p. 615.)

[9] This construction of the two sections together is reasonable and necessary. "It is also fundamental that where two statutes are *in pari materia* they should be not only construed together, but they should be reconciled so as to uphold both of them if reasonably possible." (*Modesto Irr. Dist.* v. *City of Modesto* (1962) 210 Cal.App.2d 652, 656 [27 Cal. Rptr. 90].)