IN RE: Roy DIXON, Jr., Debtor.

General Retirement System of the City of Detroit, Police and Fire Retirement System of the City of Detroit and the Board of Trustees of the City of Pontiac General Employees Retirement System, Plaintiffs,

v.

**Roy Dixon, Jr., Defendant.**

**CASE NO. 11–75482–WLH**
**ADV. NO. 12–5222**

United States Bankruptcy Court,
N.D. Georgia, Atlanta Division.

Signed July 28, 2015

Jordan S. Bolton, Clark Hill PLC, Birmingham, MI, Peter Jackson, Clark Hill PLC, Peter A. Jackson, Detroit, MI, Darryl S. Laddin, Arnall Golden Gregory LLP, Atlanta, GA, Cynthia J. Billings, Wallace M. Handler, Sullivan, Ward, Asher & Patton, P.C., Southfield, MI, for Plaintiff.

Roy Dixon, Jr., pro se.

## ORDER ON DETROIT PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND MOTION REGARDING ALLOCATION OF DAMAGES

Wendy L. Hagenau, U.S. Bankruptcy Court Judge

The "Detroit Plaintiffs" filed their Motion for Partial Summary Judgment on Counts II and IV [Docket No. 118] ("Motion") and Motion Regarding Allocation of Damages [Docket No. 121] ("Allocation Motion") following this Court's Order of February 10, 2015 [Docket No. 105], granting summary judgment to the Detroit Plaintiffs on certain claims and to PGERS on certain claims ("Prior Summary Judgment Order"). The abbreviations used herein are those defined in the Prior Summary Judgment Order and this Order presumes familiarity with the Prior Summary Judgment Order. As an overview, the General Retirement System of the City of Detroit ("Detroit GRS"), Police and Fire Retirement System of the City of Detroit ("Detroit PFRS") (Detroit GRS and Detroit PFRS are referred to collectively as "Detroit Plaintiffs"), and the Board of Trustees of the City of Pontiac General

Employment Retirement System ("PGERS") invested over $22 million in a limited partnership operated by the Debtor, the vast majority of which was lost. The Plaintiffs seek a determination of the dischargeability of their claims in this adversary proceeding. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157, and this is a core proceeding under 28 U.S.C. § 157(b)(2)(I).

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "[T]he substantive law [applicable to the case] will identify which facts are material". *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The party moving for summary judgment has "the initial responsibility of informing the ... court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits if any' which it believes demonstrate the absence of a genuine issue of material fact." *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir.1991) (citing *Celotex Corp.*, 477 U.S. at 323, 106 S.Ct. 2548).

Once this burden is met, the nonmoving party cannot merely rely on allegations or denials in its own pleadings. Fed. R. Civ. P. 56(e). Rather, the nonmoving party must present specific facts that demon-strate there is a genuine dispute over material facts. *Hairston v. Gainesville Sun Pub. Co.*, 9 F.3d 913, 918 (11th Cir.1993). Lastly, when reviewing a motion for summary judgment, a court must examine the evidence in the light most favorable to the nonmoving party and all reasonable doubts and inferences should be resolved in favor of the nonmoving party. *Id.*

## PRIOR PROCEEDINGS

In the motion resulting in the Prior Summary Judgment Order, all three Plaintiffs moved for partial summary judgment under Counts I and III of the Amended Complaint, and PGERS moved for summary judgment in its favor alone under Count III on alternative factual grounds. The Plaintiffs reserved their claims under the remaining counts of the Amended Complaint as well as for additional sums under Counts I and III. After consideration of the undisputed facts, the Court granted summary judgment to PGERS in the amount of $3,643,200 resulting from the Debtor's fraudulent Letter to PGERS regarding Fullen's position with OCA and determined the claim was non-dischargeable ("PGERS Claim"). The Court also granted summary judgment to all Plaintiffs in the amount of $886,426.10 ("Fraud Damages") resulting from the Debtor's fraud and misappropriation of money invested by the Plaintiffs. The Court determined the Fraud Damages claim was non-dischargeable. The Court, however, could not determine from the evidence before it how the damages should be allocated among the Plaintiffs.

After a status conference, the Court established a schedule for the filing of any other substantive motions for summary judgment and the filing of briefs regarding the allocation of damages awarded in the Prior Summary Judgment Order as well as any damages sought in any new motions

for summary judgment. As a result, the Detroit Plaintiffs filed the Motion, arguing the Debtor is liable to them for conversion which, under Michigan law, entitles them to treble damages, of the following amounts: (a) $1,048,000 (which includes the Fraud Damages), (b) $730,000 allegedly misapplied by Michael Farr with the Debtor's knowledge, and (c) $2,063,543 resulting from excess management fees and other funds allegedly paid to the Debtor. The Detroit Plaintiffs allege all these claims are non-dischargeable under 11 U.S.C. §§ 523(a)(4) and/or (a)(6). The Detroit Plaintiffs also filed the Allocation Motion attaching additional information. The Court then entered a Notice Pursuant to Fed. R. Bankr.P. 7056 [Docket No. 126] informing the parties that it would rely upon the entire record in making its decision, including matters submitted to the Court by either party in connection with the original motion for summary judgment. The Notice also informed the Detroit Plaintiffs they had not pointed the Court to materials in the record to substantiate how the alleged damages of $1,048,000 and $2,063,543 were calculated. As a result, the Detroit Plaintiffs supplemented their briefing [Docket No. 130], The Debtor responded to the Motion [Docket No. 135],[1] Oral argument on the Motion and the Allocation Motion was held on July 7, 2015.

## ANALYSIS OF CLAIMS

The Court relies on the same sources of undisputed facts as set out in the Prior Summary Judgment Order, i.e., the District Court Order, the deemed admissions and the Debtor's actual admissions in response to the Complaint and motions for summary judgment. Additionally, the Court relies on the submissions by the Detroit Plaintiffs and the Debtor in connection with this Motion.

### Claim for Conversion of $1,048,000

■■■ The Detroit Plaintiffs assert the Debtor converted $1,048,000 of which the Fraud Damages are a part. The Detroit Plaintiffs rely on the District Court Order[2] which ordered the Debtor to disgorge $3,112,343.00, consisting of $2,063,543 allegedly taken in excess management fees and $1,048,800 labeled as the Debtor's misappropriations through Farr and his companies. The Detroit Plaintiffs assert the amount to be disgorged equals their damages without further analysis. The Detroit Plaintiffs, however, misunderstand the nature of an order of disgorgement. The District Court explains:

> Disgorgement is an equitable remedy which removes ill-gotten gain by forcing surrender of profits. *United States v. Universal Servs. Mgmt. Inc.,* 191 F.3d 750, 760, 763 (6th Cir.1999). The purpose of disgorgement is not to compensate the victims of fraud, but to deprive the wrongdoer of his ill-gotten gain. *Id.* at 763–64. Once the Commission has established that a defendant has violated the securities laws, the district court possesses the equitable power to grant disgorgement *without* inquiring wheth-

1. Although the Debtor's response was untimely, the Court reviewed and considered the Debtor's response together with his prior pleadings in response to the original motion for summary judgment.

2. The United States District Court for the Eastern District of Michigan entered a subsequent order entitled, "Order Regarding Disgorgement, Prejudgment Interest and Civil Penalty Against Defendants", in the case of *United States Securities and Exchange Commission v. Onyx Capital Advisors, LLC, Rov Dixon. Jr, and Michael A. Farr,* Case No. 10–11633 ("District Court Disgorgement Order") on January 31, 2014 confirming, *inter alia,* the disgorgement amount ordered in the District Court Order. 2014 WL 354491 (E.D.Mich.2014).

er, or to what extent, identifiable private parties have been damaged by fraud. *See SEC v. Blavin,* 760 F.2d 706, 713 (6th Cir.1985). 2014 WL 354491 at *2. Since the District Court Order is not intended to be, and contains no information stating it is, based upon damages suffered by the Detroit Plaintiffs, the mere fact the District Court ordered disgorgement of the sum of $1,048,000 is not determinative as to whether the Detroit Plaintiffs have suffered those damages as a result of conversion or otherwise by the Debtor. The court will independently evaluate the Detroit Plaintiffs' claims of conversion.

Under Michigan law, conversion is "any distinct act of dominion wrongfully asserted over another's personal property." *Trail Clinic, P.C. v. Bloch,* 114 Mich. App. 700, 319 N.W.2d 638, 640 (1982). "Conversion may occur when a party properly in possession of property uses it in an improper way, for an improper purpose, or by delivering it without authorization to a third party." *Dept. of Agriculture v. Appletree Marketing, L.L.C.,* 485 Mich. 1, 779 N.W.2d 237, 244–45 (2010). "[A] person may be guilty of a conversion by actively aiding or abetting or conniving with another in such an act. Indeed, one may be liable for assisting another in a conversion though acting innocently. These rules are especially applicable where the defendant received benefit from the conversion and subsequently approved and adopted it." *Trail,* 319 N.W.2d at 641.

The Detroit Plaintiffs refer to the $1,048,000 sum as Debtor's "misappropriation through Farr and his companies". They allege the sum consists of damages of $948,800 and $100,000. The SEC's motion for summary judgment [Docket No. 130, Ex. A], on which the District Court based the District Court Order, describes the $948,800 sum as the amount "trans-

ferred from the Second Chance Entities to Sea Jay without a legitimate business purpose". The Detroit Plaintiffs clarified at oral argument that the $948,800 number was the sum of all funds transferred by the Second Chance Entities to Sea Jay, net of any funds Sea Jay returned to the Second Chance Entities. Since these transfers all occurred within Farr's companies, as opposed to the Debtor's companies, that calculation alone is insufficient to establish as a matter of law that the Debtor wrongfully asserted "dominion" over the funds, directed the transfers or benefitted in any way from the transfers. Instead, the Court must determine whether the funds from Sea Jay or SCM actually were converted by the Debtor.

The Detroit Plaintiffs allege the Fraud Damages are included in the $948,800 number. The SEC's motion for summary judgment includes further evidence supporting this Court's award of Fraud Damages. The Court concludes the Debtor converted the Fraud Damages of $886,426.10 when he wrongfully asserted dominion over this property which rightfully belonged to the investors, as set out in this Court's Prior Summary Judgment Order. The Court, however, cannot identify the specific transfers that make up the difference between $948,800 and the Fraud Damages and therefore cannot grant summary judgment with respect to that amount.

The Detroit Plaintiffs then allege an additional $100,000 of the "$1,048,000" which they seek is a misappropriation "through one of Farr's Second Chance car dealerships (Second Chance of Houston), when the bank holding Sea Jay's accounts ran out of cash to meet the Debtor and Farr's rapid demands for hundreds of thousands of dollars in cash at the end of 2008." Detroit Plaintiffs' Supplemental Memorandum (Docket No. 130, p. 3). Farr testified

in his deposition that he made numerous cash withdrawals in December 2008 and provided the cash to the Debtor. Farr testified it was his understanding the Limited Partnership Fund was "short". (District Court Order, p. 14–15). The SEC's motion for summary judgment states at footnote 5 that Farr transferred $100,000 to Second Chance Motors of Houston LLC on December 29, 2008. [Docket No. 130, Ex. A], This transfer is supported by the Declaration of Edward Holland dated April 21, 2010 ("First Holland Declaration") [Docket Nos. 121 and 124] and Exhibit 22 thereto. Footnote 5 continues, "Farr withdrew $100,000 in cash from that account the next day and gave it to Dixon". [Docket No. 130, Ex. A], This statement, however, is not entirely borne out by the First Holland Declaration, which instead avers that $130,000 was deposited into Onyx Capital's BB & T account on December 30, 2008.[3] What the Court can conclude from the evidence before it is that $100,000 was withdrawn from the SCM Houston account and that all or a substantial portion of that money was deposited the same day into an OCA account.

The Debtor, in his Response to the Detroit Plaintiffs' Motion, stated that during the end of 2008, he and Farr were obtaining cash and depositing it into the Limited Partnership Fund so as to satisfy certain liquidity requirements to purchase Stewart Automotive Finance Company. The facts are therefore disputed as to whether the $100,000 in cash that was withdrawn from the SCM Houston account was used by the Debtor for his own personal benefit, as opposed to deposited in the Limited Partnership Fund account. Since the undisputed facts do not establish that the Debtor exercised dominion wrongfully over this $100,000 transfer, the Court cannot grant summary judgment as to that amount.

■ Under MCL 600.2919a, the Fraud Damages, which the Court concludes are also damages for conversion, can be trebled if the conversion was made to the debtor's own use. "Own use" has been defined by the Michigan Court of Appeals as requiring that a person "employ for some purpose" the converted property. *Aroma Wines v. Columbian Distribution Services*, 303 Mich.App. 441, 844 N.W.2d 727, 731 (2013). The Court has already found in the Prior Summary Judgment Order that the Fraud Damages were funds paid to the Debtor personally or paid to contractors on the Debtor's home. The Court therefore concludes the conversion was of funds the Debtor used personally.

The Detroit Plaintiffs argue that trebling is required once the standard is met, notwithstanding the opinion of *Aroma Wines* that an award of treble damages for statutory conversion is discretionary. The Detroit Plaintiffs argue this is an incorrect decision. Nevertheless, the *Aroma Wines* decision stands. The Court's research indicates that the *Aroma Wines* decision regarding the discretionary nature of treble damages is consistent with other holdings on this point. After the *Aroma Wines* decision, the Court of Appeals in *Hoffenblum v. Hoffenblum*, 308 Mich.App. 102, 863 N.W.2d 352 (2014), cited *Aroma Wines* for the proposition that the award of treble damages is discretionary not mandatory. The bankruptcy court in Michigan relied on *Aroma Wines* in holding that the award of treble damages is discretionary. *In re Hanif*, 530 B.R. 655, 671 (Bankr.E.D.Mich.2015). At least two other bankruptcy decisions pre-dating the *Aroma Wines* case also noted that treble

---

**3.** Footnote 5 refers to Farr's deposition transcript at pages 178–179 in further support of the statement that the money was given to the Debtor. However, pages 178–179 are not included in the Court record and the Court therefore cannot rely upon it.

damages were discretionary. *See In re Stewart,* 499 B.R. 557, 570 (Bankr. E.D.Mich.2013) (trebling is not automatic); *In re Hamade,* No. 11–68553, 2013 WL 663736 at *9 (Bankr.E.D.Mich. Feb. 15, 2013) (case was not appropriate for the court to use its discretion to grant treble damages); *In re Anton,* No. 08–64144, 2013 WL 1747907 at *10 (Bankr.E.D. Mich. April 12, 2013) ("trebling is not automatic, but rather, is left to the exercise of judicial discretion"). This Court concludes the *Aroma Wines* decision and the cases which follow it are the current state of Michigan law and hold that an award of treble damages is discretionary.

The Court must next determine the factors it should consider in deciding whether to exercise it discretion to treble damages. In *Hoffenblum,* the appellate court ruled the trial court did not abuse its discretion when it declined to award treble damages based on a finding that the tortfeasor did not act with "dishonest motives" but relied on the advice of his financial advisor. In *Stewart,* the court noted a decision about treble damages should be based on what was fair under the circumstances. *See also Anton* ("what is fair is what is just and equitable"). The Michigan courts have also noted that an award of treble damages is "designed to penalize or punish 'dishonest defendants' ". *Hoffenblum,* 863 N.W.2d at 360; *Days Inn Worldwide, Inc. v. Adrian Motel Co., LLC,* No. 07–13523, 2009 WL 3199882 at *17 (E.D.Mich. Sept. 30, 2009) (in exercising discretion, a court considers whether the act was willful and whether trebling the damages would deter future acts). Surveying court decisions in other states with similar statutes, courts look to whether the conversion was "willful and malicious". *Baker v. Ramirez,* 190 Cal.App.3d 1123, 1138, 235 Cal.Rptr. 857 (Cal.Ct.App.1987); *see also Drewry v. Welch,* 236 Cal.App.2d 159, 172, 46 Cal. Rptr. 65 (Cal.Ct.App.1965) ("The above

cases clearly lay down the rule, without conflict, that treble damages may only be awarded when the wrongdoer intentionally acted willfully or maliciously. The intent required is the intent to vex, harass, or annoy or injure the plaintiff")

■ As stated above, the Court agrees the Debtor converted the Fraud Damages to his own use, so an award of treble damages is permitted under MCL 600.2919a. The Court also concludes that trebling the Fraud Damages is appropriate in this case. As stated in the Court's Prior Summary Judgment Order, the Fraud Damages were awarded by this Court to the Plaintiffs as a result of the Debtor's fraud, which is non-dischargeable. The findings of this Court leading to the determination that the Debtor defrauded the Plaintiffs are the same findings which support the Court exercising its discretion to treble those damages. Trebling is reserved for parties who acted with intent, or willfully, or maliciously as opposed to accidentally. As the Court found in its Prior Summary Judgment Order, the Debtor acted with intent and used a device, scheme or artifice to defraud, and this intent authorizes the Court to order the damages to be trebled.

### Claim for Conversion of $730,000

■ The Detroit Plaintiffs next argue the Debtor should be liable for conversion of $730,000 and that amount should be deemed non-dischargeable. The Detroit Plaintiffs' claim is based on the following undisputed facts: On September 10, 2007, Michael Farr withdrew $730,000 of the Limited Partnership Fund investment proceeds and deposited that amount to his and his wife's personal bank account. With the Debtor's knowledge and consent, Farr used that money to cure his Michigan condominium mortgage default and to pur-

chase, in Sea Jay's name, the Marietta property which Sea Jay then leased to SCM for use as its headquarters. Were it not for this money, neither Farr nor the Second Chance Entities would have had enough money to cure Farr's mortgage default or purchase the Marietta property.

■ Construing the undisputed facts in the light most favorable to the Debtor, as the Court must do on a motion for summary judgment, the undisputed facts do not establish as a matter of law that the *Debtor* converted $730,000. First, there is no evidence the *Debtor* exercised any act of dominion or control over the $730,000. Rather, the undisputed facts show that Farr asserted such control. The District Court Disgorgement Order requires *Farr* to disgorge this specific sum. The Detroit Plaintiffs argue the Debtor is liable for conversion because he was aware that investment proceeds were being used by Farr personally and to acquire property in the name of an entity in which the Limited Partnership Fund held no interest. Under Michigan law, a party not in control may be liable for conversion, but only if the person "actively" aided, abetted or connived or received the benefit of the conversion. *Trail*, 319 N.W.2d at 641. The undisputed facts establish, at most, a passive acceptance by the Debtor of Farr's activities rather than active aiding, abetting or conniving. The undisputed evidence does not establish the Debtor provided the funds to the SCM Entities knowing Farr would use a portion for the purpose of paying a mortgage and buying the property. The money was provided to SCM earlier. The undisputed evidence does not establish the Debtor suggested to Farr he structure the transaction in this way. There is no evidence in the record the Debtor received any benefit from the $730,000 used by Farr. For those reasons, the Court concludes the undisputed facts do not establish as a matter of law that the Debtor converted $730,000 from the Detroit Plaintiffs.

### Claim for Conversion of $2,063,543

The Detroit Plaintiffs last ask in their Motion that the Court find $2,063,543 is owed to all Plaintiffs collectively for conversion, the damages should be trebled and the damages are nondischargeable. This sum is again based on the District Court Order which referred to the sum as "excess management fees". In response to this Court's Notice Pursuant to Fed. R. Bankr. P. 7056 [Docket No. 126], the Detroit Plaintiffs clarified that this $2 million sum consists of $1,742,998 in excess management fees and $120,545 in net cash withdrawals the Debtor took directly from the Limited Partnership Fund's bank accounts. It is evident that the sum of these numbers is not $2,063,543. The Detroit Plaintiffs explained this difference in Footnote 4 of their Supplemental Memorandum [Docket No. 130] and have agreed to pursue the lesser amount.

As background, the District Court in its Order found the Debtor and OCA obtained excess management fees. The District Court's findings are entitled to collateral estoppel effect as set forth in the Prior Summary Judgment Order as these findings were necessary to the District Court's conclusion that the Debtor violated the Investment Advisers Act. The District Court found Article 5 of the Partnership Agreement provided that OCA was entitled to an annual management fee of 2% of the committed capital in the Limited Partnership Fund, payable quarterly. Based on total commitments of $25 million, the District Court found OCA was entitled to maximum management fees for 2007, 2008 and 2009 of approximately $1.3 million. The District Court's findings were based on the First Holland Declaration, which

has not been disputed. Pursuant to the First Holland Declaration, OCA withdrew $4,643,817 from the Limited Partnership Fund and repaid $1,500,578. OCA, therefore, retained $3,101,239 while only being entitled to management fees of $1,291,667. This differential is $1,809,572, which is the basis for the District Court's finding that the Debtor and OCA misappropriated approximately $1.8 million in excess management fees. As described in the Detroit Plaintiffs' Supplemental Memorandum [Docket No. 130] at Footnote 4, certain other discrepancies permit this number to be reduced to $1,742,998.

The Debtor argues the Limited Partnership Agreement did not prohibit "advance" management fees. Even if that is true, nothing in the Limited Partnership Agreement contemplates the general partner withdrawing more than three times the permitted management fees. Moreover, the Limited Partnership Agreement prohibited OCA from borrowing money from the Limited Partnership Fund. (¶ 6.8). The multiple withdrawals and partial repayments are evidence the Debtor used the Limited Partnership Fund monies as his own personal account rather than to truly advance management fees.

 Based on the District Court's findings, and the findings in this Court's Prior Summary Judgment Order, the Debtor controlled OCA and OCA misappropriated $1,742,998, which it designated as management fees, but to which it was not entitled as management fees. The Debtor's use of OCA to exercise rights over the personal property of the investors in the Limited Partnership Fund in denial of and inconsistent with the investors' rights therein is conversion under Michigan law. Moreover, Michigan law permits the person directing the act, even if it was not the direct recipient of the funds, to be personally liable for conversion. *Appletree*

*Marketing,* 485 Mich. 1, 779 N.W.2d 237 (member manager who causes limited liability company to breach duties personally liable for conversion). An officer or agent or manager of a corporation can be liable for the torts committed by the corporation when the director, officer or manager was participating in or assenting to the torts committed, as discussed in the Prior Summary Judgment Order. The Debtor is therefore liable for conversion of the excess management fees.

 The balance of the $2 million sum the Detroit Plaintiffs seek as additional damages is attributed to net withdrawals the Debtor personally took from the Limited Partnership Fund's bank accounts. This assertion is also based on the First Holland Declaration. [Docket No. 124], A review of the First Holland Declaration shows this $120,545 consists of four basic transactions. First, the Debtor withdrew $363,500 from the Limited Partnership Fund and repaid $314,000, leaving $49,500 due the Fund (¶ 57). Second, $35,644.75 in cash was withdrawn from the Limited Partnership Fund accounts, and $56,000 in cash was repaid, showing an excess of $20,355.25 in cash deposited (¶ 58). Third, Onyx Financial Group LLC received $500,000 from the Limited Partnership Fund's bank accounts and returned $427,800 to it, leaving a net of $72,200 owed the Fund (¶ 59). Onyx Financial Group LLC, according to the Debtor's Statement of Financial Affairs, is 100% owned by the Debtor. (SOFA Question No. 21). Finally, Mr. Holland states the Debtor received $3,200 from Onyx Intelligence and that $17,000 in cash was withdrawn from the Onyx Intelligence bank accounts with $1,000 being repaid (¶¶ 63 and 64). Onyx Intelligence is not an entity identified in the Debtor's schedules and the Court has been presented with no evidence about it. Moreover, the parties

have not directed the Court to any fact that the money in Onyx Intelligence's bank accounts came from the Limited Partnership Fund. The Court therefore discounts that sum. The Court concludes the Debtor received an excess of $49,500 directly from the Limited Partnership Fund and an excess of $72,200 from the Limited Partnership Fund through its payments to Onyx Financial Group LLC. The Court credits the Debtor with the excess cash deposited of $20,355.25. The Debtor therefor received $101,344.75 from the Limited Partnership Fund.

The Debtor's direct withdrawal from the Limited Partnership Fund of $363,500 is not authorized under the Limited Partnership Agreement. Fees are only permitted to the general partner, which was OCA, and not the Debtor. The Debtor's lack of authority to withdraw this sum of money is further evidenced by the fact he repaid $314,000 of that sum, indicating he knew the money was not his. The undisputed facts show the money was withdrawn by the Debtor and deposited by the Debtor. The Court therefore concludes the Debtor exercised wrongful dominion over the property of the investors in the Limited Partnership Fund and is liable for conversion. Similarly, there is no basis in the Limited Partnership Agreement for a $500,000 transfer to Onyx Financial, of which the Debtor owned 100%. The Debtor disclosed in his Statement of Financial Affairs that Onyx Financial is an insurance representative. The Debtor has provided no basis for payment of $500,000 to an insurance representative from the Limited Partnership Fund. Moreover, the fact that the Onyx Financial Group returned $427,800 of the transfers is evidence there was no basis for the payment of this sum. Because the Debtor owned 100% of Onyx Financial Group, the Court concludes the actions were those of the Debtor for which

he is liable for conversion in the amount of $101,344.75:

The Detroit Plaintiffs contend any award of damages for conversion should be trebled under MCL 600.2919a($l$). As discussed above, treble damages are permitted when a person stole, embezzled or converted property to another person's own use. The Michigan Court of Appeals in *Aroma Wines* ruled the "definition of 'use' encompasses a much broader meaning. The term 'use' requires only that a person 'employ for some purpose'" the converted property. 844 N.W.2d at 731. In *Aroma Wines*, where wine was the subject of the conversion, the court held that not only drinking or selling wine would be for the defendant's own use, but to the extent the defendant moved the wine in order to use space for another customer or that the debtor withheld the use of the wine in order to leverage payments on a debt, such acts were for the debtor's "own use". The undisputed facts here are that the Debtor was the managing member of OCA, was the majority member of OCA, owning between 85% and 90% of the membership interests during the period of December 31, 2006 through 2010 and during that time he alone controlled OCA. The District Court Order concluded, "There is no genuine issue of material fact that Dixon has controlled Onyx Capital since its inception." *U.S. S.E.C. v. Onyx Capital Advisors, LLC, Dixon*, 2012 WL 4849890 at *7 (E.D.Mich. 2012). The Debtor, as the managing member of OCA, which was the general partner of the Limited Partnership Fund, was the person through which OCA acted. Given the Debtor's control of OCA, the Court concludes the conversion of excess management fees was for the Debtor's own use. Likewise, with both the Debtor's direct withdrawals from the Limited Partnership Fund and the Debtor's transfers from the Limited Partnership Fund to

Onyx Financial Group LLC, the Court concludes the payments were for the Debtor's personal use.

The Court also concludes that trebling the conversion damages is appropriate. The withdrawal of funds was willfully undertaken by the Debtor. The fact that certain of the funds were repaid is further evidence the Debtor knew he had withdrawn more than was permitted. The Debtor as the managing member of the manager of the Limited Partnership Fund owed a fiduciary duty to the other members of the Limited Partnership Fund as discussed by the Court in its Prior Summary Judgment Order. The Court also notes the books and records of the Limited Partnership Fund reflected the payments as management fees or prepaid management fees when they were not due. Mislabeling the payments in the books is evidence the Debtor intended to deceive the other participants in the Limited Partnership Fund. All the foregoing convinces the Court that it is fair under the circumstances to treble the conversion damages of $1,844,342.75 to total damages of $5,533,028.25.

## DISCHARGEABILITY

The Court held in its Prior Summary Judgment Order that the Fraud Damages were nondischargeable as a result of actual fraud and false pretenses. In this Motion, the Detroit Plaintiffs have asked that the Fraud Damages be trebled and the trebled award found non-dischargeable. Given the Court's prior findings that the Debtor's fraud leading to those damages justifies them being non-dischargeable, the Court concludes that those damages as trebled are also nondischargeable. *See Cohen v. de la Cruz*, 523 U.S. 213, 218, 118 S.Ct. 1212, 140 L.Ed.2d 341 (1998).

 The Detroit Plaintiffs allege the excess management fees and the funds withdrawn from the Limited Partnership Fund account are non-dischargeable under Section 523(a)(4) as embezzlement or under Section 523(a)(6) for willful and malicious injury to property. Embezzlement under Section 523(a)(4) is the fraudulent appropriation of property by a person to whom such property has been lawfully entrusted or into whose hands it has lawfully come. *In re Lam*, 2008 WL 7842072 (Bankr.N.D.Ga.2008). In order to establish a claim for embezzlement under Section 523(a)(4), a plaintiff must prove that a debtor appropriated funds to his or her benefit, and that the debtor did so with fraudulent intent or deceit. Fraud in this sense means positive fraud or fraud in fact. *Id.* The Court has concluded with respect to the excess management fees that the Debtor appropriated the fees to his benefit and has also concluded he did so willfully and deceitfully. It is undisputed the Debtor identified these transactions in the books and records of the Limited Partnership Fund as management fees when there was no basis for doing so. The Court concludes this was done in order to deceive the investors into believing the transfers were appropriate. As such, the Court concludes the award of damages, as trebled, for excess management fees is non-dischargeable as embezzlement under Section 523(a)(4).

 With respect to the funds the Debtor withdrew from the Limited Partnership Fund account, the element of deceit has not been established as a matter of law. The Debtor appears to have identified those withdrawals as related company accounts receivable, even though such loans were not permitted under the Limited Partnership Agreement. Nevertheless, the amount owed by the Debtor is non-dischargeable under Section 523(a)(6), which requires a willful and malicious injury by the debtor to the property of anoth-

er entity. The term "willful" means intentional and deliberate; "malicious" means "wrongful and without just cause or excessive even in the absence of personal hatred, spite or ill will." *Lee v. Ikner (In re Ikner)*, 883 F.2d 986, 991 (11th Cir.1989); *Chrysler Credit Corp. v. Rebhan*, 842 F.2d 1257, 1263 (11th Cir.1988) *abrogated on other grounds by Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991); *Sunco Sales. Inc. v. Latch (In re Latch)*, 820 F.2d 1163, 1166 n. 4 (11th Cir.1987). The debtor, through his acts, must have actually intended the injury, not just taken intentional acts which resulted in an injury. *Kawaauhau v. Geiger*, 523 U.S. 57, 62, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998). "[A] debtor is responsible for 'willful' injury when he or she commits an intentional act the purpose of which is to cause injury or which is substantially certain to cause injury." *In re Walker*, 48 F.3d 1161, 1165 (11th Cir.1995). Because the term "willful" means intentional and deliberate, it cannot be established merely by applying a recklessness standard. *In re Ikner*, 883 F.2d at 991. A finding of reckless disregard may be sufficient to establish maliciousness, as it can be implied or constructive. *Chrysler Credit Corp.*, 842 F.2d at 1262–63.

Here, the Debtor intentionally withdrew money from the Limited Partnership Fund for deposit into his personal accounts and into the account of his wholly owned company, Onyx Financial Group LLC. Although the repayment of some of the funds could evidence the Debtor did not intend an injury, the Court concludes the amount of money transferred and the frequency of the transfers as evidenced by the First Holland Declaration show the Debtor knew his actions were substantially certain to cause injury to the investors in the Limited Partnership Fund. The Debtor's acts were also malicious. No basis existed for the withdrawal of the funds, and the withdrawals were wrongful under the Limited Partnership Agreement. To prove maliciousness, the Plaintiffs need not show the Debtor intended ill will toward the Limited Partnership Fund investors. Here, the Court concludes the Debtor's acts were malicious because they were wrongful and without just cause and excessive because of the repeated withdrawals. As such, the Court concludes the total damages to all Plaintiffs for the Debtor's withdrawal of funds from the Limited Partnership Fund of $101,344.75 as trebled to $304,034.25 is non-dischargeable under 11 U.S.C. § 523(a)(6).

## DETROIT PLAINTIFFS' ALLOCABLE SHARE

The Court asked the parties to brief the allocation of the Fraud Damages which the Court awarded to the collective Plaintiffs in its Prior Summary Judgment Order. The Debtor took no position on the allocation. Pontiac GERS filed a notice that it has no claim to the Fraud Damages [Docket No. 116], Nevertheless, the Detroit Plaintiffs assert only a 90% interest in the Fraud Damages. Consequently, of the award of $886,426.10 as trebled to the amount of $2,659,278.30, $2,393,350.47 is awarded to the Detroit Plaintiffs and is non-dischargeable.

With respect to the claim of $1,742,998 for excess management fees, the Detroit Plaintiffs assert their pro rata share is $1,549,015.48. Pontiac GERS does not dispute this calculation and the Debtor took no position. As set forth above, this amount will be trebled to $4,647,046.44 awarded to the Detroit Plaintiffs and is non-dischargeable.

Finally, with respect to the amount of $101,344.75 awarded for amounts the Debtor personally received from the Limited Partnership Fund's bank accounts, the

Detroit Plaintiffs contend they are entitled to 84% of the recovery. This equals $85,129.59. Pontiac GERS does not dispute this calculation and the Debtor takes no position. The Court has ordered this sum to be trebled, so the Detroit Plaintiffs are entitled to recover $255,388.77 and this claim is nondischargeable.

## CONCLUSION

In summary, the Court awarded $886,426.10 in Fraud Damages in its Prior Summary Judgment Order. Ninety percent of this sum is attributable to the Detroit Plaintiffs' investment. This sum will be trebled for the Debtor's conversion of the sum to equal *$2,393,350.47* in damages awarded to the Detroit Plaintiffs. Secondly, the Court has found that all Plaintiffs suffered damages in the amount of $1,742,998 as a result of excess management fees paid, of which the Detroit Plaintiffs are entitled to $1,549,015.48. This sum trebled equals *$4,647,046.44*. Finally, the Court has found that all Plaintiffs are entitled to recover $101,344.75 as a result of the Debtor's conversion of funds from the Limited Partnership Fund bank accounts. The Detroit Plaintiffs are entitled to $85,129.59 of this recovery. This sum trebled equals *$255,388.77*. The Detroit Plaintiffs therefore have suffered damages as a result of Debtor's fraud and conversion of $7,295,785.68, all of which is nondischargeable.

**IT IS ORDERED as set forth below:**